**WILSON TROPHY COMPANY,**
**Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**WILSON TROPHY COMPANY,**
**Respondent,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner.**

**Nos. 92–2163, 92–2275.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 17, 1992.

Decided April 8, 1993.

Rehearing and Rehearing En Banc Denied
May 18, 1993 In No. 92–2163.

Michael E. Wilson, St. Louis, MO, argued, for petitioner.

Michael Gan, NLRB, Washington, DC, argued, for respondent.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and STROM,[*] District Judge.

WOLLMAN, Circuit Judge.

Wilson Trophy Company petitions for review of a decision and order of the National Labor Relations Board; the Board cross applies for enforcement of its order. We affirm the Board's decision and enforce its order.

## I.

Wilson Trophy Company (Wilson) manufactures and sells trophies and related products at its facility in St. Louis, Missouri. The facility includes an office area and a warehouse, which is divided into several departments. The office employees are not represented by any labor organization. The warehouse employees, on the other hand, are represented by the Leather Goods, Plastics and Novelty Workers' Union, Local 160 (the "union"). The contract between the union and Wilson provides that the minimum starting rate for full-

[*] The HONORABLE LYLE E. STROM, Chief Judge, United States District Court of the District of Nebraska, sitting by designation.

time warehouse employees shall be $4.40 per hour. It further provides that after thirty days of employment, an employee's wage rate will be increased by a minimum of ten cents per hour.

In the spring of 1991, Wilson hired several new warehouse employees. By June, the warehouse was buzzing with the rumor that these new employees were earning more than $5 per hour. This rumor upset those employees who had started at $4.40 per hour and were still earning less than $5 per hour. When Jeff Shell, a clerk in the shipping and receiving department of the warehouse, heard this rumor, he asked his immediate supervisor, John Miller, whether he knew anything about the new hires' wages. Miller indicated that he did not. Later that day, Jeff visited his mother, Ruth Shell, who worked as an accounts receivable clerk in the Wilson office. While in her office, he informed her that some of the new warehouse employees were bragging about earning more than $5 per hour.

Kathy Miloshewski, Ruth Shell's immediate supervisor and officemate, overheard the Shells' conversation. She told Jeff that the wage rumors were untrue; everyone in the warehouse started at the union contract minimum of $4.40 per hour. After her conversation with Jeff Shell, Miloshewski spoke with controller Charles Martin, who supervised the accounting department, and warehouse supervisor David Wall. She informed them that warehouse employees were discussing wage rates and that the whole warehouse was getting "worked up."

Shortly after Jeff Shell had left his mother's office, John Miller also came to Ruth Shell's office to discuss the wage disparity issue. He too was upset about the rumor that the new hires were being paid more than he was. Martin observed their meeting and later that day asked Miller what he and Ruth Shell had discussed. Miller told Martin that they had discussed warehouse wage rates.

Jeff Shell next talked to Wall, who was in charge of hiring warehouse employees, about starting wage rates in the ware-house. Wall said that everyone he had hired started at $4.40 per hour and then moved to $4.50 per hour after thirty days of employment. Following his conversation with Wall, Jeff Shell learned that Wall had given another warehouse employee a different answer to a question about wage rates. Jeff told Ruth Shell about Wall's different responses.

While in the warehouse the next day, Ruth Shell spoke with Jeff, his supervisor Miller, and Bill Martin, another member of the shipping and receiving department. She informed them that they should discuss the wage issue with the union shop steward, Barbara McGee. As the department supervisor, Miller volunteered to speak with McGee. McGee told Miller that she needed proof that employees were being started at higher wage rates before she could pursue the matter. McGee also stated that she believed that Wilson had the authority under the union contract to hire employees at a wage above the $4.40 per hour minimum contract wage. Miller relayed McGee's comments to Jeff Shell and Bill Martin.

Unsatisfied with McGee's answer, Jeff Shell, Miller, Martin, and Bill Henry, the fourth member of the shipping and receiving department, again spoke with Ruth Shell about the wage issue. They asked her to call the union to find out if they could do anything about the wage disparity without proof. Ruth Shell agreed to do so.

On June 20, 1991, Ruth Shell called the union. Miloshewski overheard Shell's call and told Charles Martin about it. Almost immediately after Shell had called, Martin came into Shell's office and asked her why she had called the union. According to Shell's testimony, she responded that she wanted to know the proper procedure for handling the problem that existed in the warehouse. Martin asked what the problem was. Shell answered that her son Jeff had told her that some warehouse employees had been bragging about earning five dollars per hour. Martin pointed his finger at her and told her that she was "not to call the union again for any reason or get further involved in the situation in the ware-

house or I will terminate you. And don't think I won't terminate you because if I find you further involved with the situation I will terminate you." After this reprimand, Shell's relationship with Miloshewski deteriorated to the point where they quit speaking to one another.

Around this same time, Martin circulated to all accounting personnel a memorandum about the July 4 holiday. As Shell read the memo, she highlighted three spelling errors. According to Shell, she had highlighted the errors before she realized that she had to sign the memo and return it to Martin. Having unsuccessfully attempted to cover up the highlighting of the errors, Shell returned the memo to Martin.

On the morning of June 25, Ruth Shell received a call from Norman Stinger, vice president and manager of Wilson Trophy Company of Ft. Worth–Dallas, one of Wilson's related companies, about an order he had received. Later that morning, Stinger called Martin and told him that Shell had been rude to him on the phone. According to Shell, however, Stinger was the one who had been rude.

When Ruth Shell returned from lunch that afternoon, Martin gave her a notice of termination. The notice reads as follows:

On Thursday, June 2[0], at 1:15 p.m., Mrs. Ruth Shell received a verbal warning from her supervisor, Charles R. Martin for her involvement in activities not related to the performance of her job. These activities served to increase an unnecessary disturbance in the workplace. She was told that any additional involvement in these activities would result in her termination from her position.

Since that time, Mrs. Shell's attitude continues to be a disruption in the workplace. She demonstrates an inability to cooperate and get along with her co-workers as evidenced by complaints received by management from other personnel in her department. This inability to cooperate and get along extends to management as well. An internal memo was recently circulated in the accounting department with instructions to sign the notice and return it to her supervisor.

Mrs. Shell returned the memo with spelling errors highlighted. A complaint was also received from the manager of one of Wilson Company's related companies.

As management does not feel that the poor attitude demonstrated by Mrs. Shell will improve, it is in the best interest of the Accounting Department and the company in general that her employment with Wilson Company be terminated.

Upon receiving the notice, Ruth Shell briefly skimmed it as Martin watched. She told Martin that she did not have an attitude problem; she had been doing her work and had not been talking to anyone since her reprimand. Martin told Shell that not speaking was part of her attitude problem. He informed her that she had two days to sign the notice and then left her office.

On July 3, 1991, Ruth Shell filed a charge with the Board, alleging that Wilson had committed unfair labor practices under the National Labor Relations Act (the "Act"). Based on her charge, General Counsel filed a complaint against Wilson.

After Shell filed her charge, two wage-related incidents occurred in the warehouse. In July 1991, warehouse manager Wall held a meeting for the male warehouse employees. According to Jeff Shell and John Miller, Wall instructed the employees not to talk about wages in the warehouse and told them that they could be fired if they did. He then asked each employee, one by one, whether the employee understood him. Additionally, sometime in September 1991, Wall observed an employee opening his paycheck among a group of employees in the warehouse. Wall informed the employee that employees were not to open their checks in the warehouse and that they would be fired if they did so.

On October 2, 1991, an Administrative Law Judge ("ALJ") held a hearing. At that time, the ALJ permitted General Counsel to amend its complaint to include the two warehouse incidents that had occurred after Ruth Shell filed her charge. The ALJ heard additional testimony on December 9, 1991. The ALJ found that Wilson (1) had violated section 8(a)(1) of the Act by inter-

rogating Ruth Shell about her call to the union, by prohibiting her from calling the union again, by reprimanding her for the call, and by discharging her; (2) had violated section 8(a)(3) by reprimanding and discharging Ruth Shell; and (3) had violated section 8(a)(1) by prohibiting its employees from engaging in wage discussions and from opening their paychecks in the warehouse. The ALJ ordered Wilson to cease and desist from all unfair labor practices and to post a notice explaining its violations to its employees. The ALJ also ordered Wilson to rescind its reprimand and discharge of Ruth Shell, to offer her reinstatement, and to make her whole for all losses of pay and benefits. The Board adopted the ALJ's decision and order.

## II.

### A. *Section 8(a)(1) violations.*

■ Section 7 of the Act provides that employees "shall have the right to self-organization, to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157. Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by section 7. 29 U.S.C. § 158(a)(1). Under this statutory framework, a prima facie violation of section 8(a)(1) is established if General Counsel proves four elements:

(1) the employee engaged in concerted activity;

(2) the employer knew of the concerted nature of the employee's activity;

(3) the concerted activity was protected by the Act; and

(4) the employer's adverse action against the employee was motivated by the employee's protected concerted activity.

*Meyers Indus., Inc.,* 268 N.L.R.B. 493, 497 (1984). Once a prima facie violation has been established, the burden shifts to the employer to show, as an affirmative defense, that it would have taken the same action even absent the protected concerted

activity. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 395, 402–03, 103 S.Ct. 2469, 2471, 2475, 76 L.Ed.2d 667 (1983).

■ Wilson raises arguments concerning each of the four elements and also raises an affirmative defense. Before turning to these arguments, we note that our standard of review affords great deference to the Board's affirmation of the ALJ's findings. We will enforce an order of the Board if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record considered as a whole, even though we might have reached a different decision had the matter been before us *de novo. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Hall v. NLRB,* 941 F.2d 684, 687–88 (8th Cir.1991).

### 1. Concerted Activity

■ Wilson argues that Ruth Shell's telephone call to the union was not concerted activity. It maintains that Ruth Shell called the union only on behalf of her son and not on behalf of the other three members of the shipping and receiving department. Wilson's argument, however, is predicated on an erroneous definition of concerted activity. Concerted activity has been defined to include the activity of an individual employee when the employee is acting on behalf of only one other employee. *See NLRB v. City Disposal Systems, Inc.,* 465 U.S. 822, 831, 104 S.Ct. 1505, 1511, 79 L.Ed.2d 839 (1984); *NLRB v. Henry Colder Co.,* 907 F.2d 765, 768 (7th Cir. 1990) (citing *City Disposal,* 465 U.S. at 831, 104 S.Ct. at 1511); *El Gran Combo de Puerto Rico v. NLRB,* 853 F.2d 996, 1002 (1st Cir.1988) (citing *City Disposal,* 465 U.S. at 831, 104 S.Ct. at 1511); *Meyers Indus., Inc.,* 281 N.L.R.B. 882 (1986); *Meyers Indus., Inc.,* 268 N.L.R.B. at 497. Accordingly, Ruth Shell was engaged in a concerted activity even if she was acting only on behalf of her son Jeff when she called the union.

### 2. Knowledge of Concerted Activity

■ Wilson argues that General Counsel failed to establish that Wilson knew of the concerted nature of Ruth Shell's phone call. We disagree. When Martin asked Ruth Shell why she had called the union, she indicated that she had called for her son Jeff. She said that Jeff had told her that some employees in the warehouse were boasting about earning $5 per hour and that she had called to learn the proper procedure for dealing with the situation. Additionally, Martin knew that John Miller had talked to Ruth Shell about the warehouse wage rate issue and that some warehouse employees had asked her to interpret the union contract. In the light of these facts, substantial evidence exists that Martin at least knew that Ruth Shell had called the union on behalf of Jeff Shell. Martin also had good reasons to believe that Ruth Shell was representing the concerns of other employees as well.

### 3. Protected Activity

■ Wilson next argues that Ruth Shell's call to the union was not protected activity because it violated section 9(a) of the Act, which provides that a union selected by the bargaining unit is the exclusive bargaining agent for members of the unit.[1] Under section 9(a), an attempt by an employee or minority group of employees to bargain directly with management constitutes unprotected activity. *See Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975).

■ We hold that Ruth Shell's telephone call to the union did not constitute activity falling outside the protection of section 9(a). Her telephone call was not an attempt to undermine the union by directly bargaining with management; rather, it was an attempt to enlist the union's aid.

■ Moreover, Ruth Shell's concerted activity is protected even though she was not a union member. As Wilson concedes, if Jeff Shell had telephoned the union to inquire about warehouse wage rates, his activity would have been protected under the Act. Ruth Shell's actions on behalf of the warehouse employees enjoys the same protection. Non-union employees as well as union employees share the right to engage in concerted activity. *See, e.g., Koch Supplies, Inc. v. NLRB*, 646 F.2d 1257, 1259 (8th Cir.1981) (stating that "concerted activities need not take place in a union setting"); *Vic Tanny Int'l, Inc. v. NLRB*, 622 F.2d 237, 241 (6th Cir.1980) (stating that section 7 protects the concerted activities of both organized and unorganized employees); *Signal Oil and Gas Co. v. NLRB*, 390 F.2d 338, 342–43 (9th Cir.1968) (finding that a non-union employee engaged in protected concerted activity).

### 4. Motivating Factor

Wilson does not dispute that Ruth Shell's telephone call to the union was a motivating factor in her interrogation and reprimand. Wilson contends, however, that the Board erred in finding that Ruth Shell's call was a motivating factor in the company's decision to discharge her.

■ In an improper discharge case, the Board is free to draw reasonable inferences from both direct and circumstantial evidence, because the employer's intent will rarely be proven by direct evidence alone. *Ballou Brick Co. v. NLRB*, 798 F.2d 339, 342 (8th Cir.1986) (citing *NLRB v. Senftner Volkswagen Corp.*, 681 F.2d 557, 559 (8th Cir.1982)). Relevant circumstantial evidence includes the timing of the discipline in relation to the protected activity. *See, e.g., NLRB v. Wells Dairy, Inc.*, 865 F.2d 175, 177 (8th Cir.1989) (per curiam).

■ With these principles in mind, we conclude that there is substantial evidence to support the Board's finding that Ruth Shell's phone call to the union was a moti-

---

1. Section 9(a) reads in pertinent part as follows: Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive rep- resentatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.... 29 U.S.C. § 159(a).

vating factor in her discharge. Almost immediately after Martin learned that Shell had called the union, Martin came to her office and interrogated her about the call. When Shell explained to Martin why she had called the union, Martin pointed his finger at her and told her that she was not to call the union again for any reason or get further involved in the warehouse situation and that if she did he would terminate her. Although Wilson permits office personnel to make personal phone calls during working hours, Martin singled out Shell's call to the union. Shell was then discharged only three working days after the reprimand. Her termination notice began by stating that she had been reprimanded and threatened with termination because she had engaged in activities not related to her job—in effect, activities related to the union.

Finding that General Counsel's prima facie case is supported by substantial evidence, we turn to Wilson's affirmative defense.

## 5. Affirmative Defense

Wilson argues that it would have terminated Ruth Shell regardless of her protected concerted activity. Relying on Martin's testimony, Wilson argues that it fired Shell because of her poor attitude and behavior, citing several incidents that occurred after Ruth Shell had been reprimanded on June 20. Wilson points to the deterioration of her relationship with Miloshewski, the phone conversation with Stinger, and the highlighting of the spelling errors in the memo.

■■■■ The ALJ and the Board discredited Martin's testimony concerning the purported legitimate reasons for Shell's discharge and found that the principal reason for the discharge was Shell's involvement in the wage disparity issue. Credibility determinations are "primarily a question for the trier of fact, and should not be reversed unless extraordinary circumstances come into play." *NLRB v. Westinghouse Elec. Corp.*, 612 F.2d 1072, 1074 (8th Cir.1979) (citing *NLRB v. Penzel Constr. Co.*, 449 F.2d 148, 149 (8th Cir.1971)). Under this standard, we conclude that we cannot reverse the ALJ's decision to discredit Martin's testimony concerning the reasons why he fired Shell.

■■■■ Indeed, the record contains good reasons to disbelieve Martin's testimony. In determining whether an employer's purported legitimate reasons for a discharge are merely pretextual, we consider whether the purported reasons for the discharge had a basis in fact or were implausible, false, or shifting. *Hall*, 941 F.2d at 688. We also examine whether the employer questioned or warned the employee about the purported conduct before terminating the employee. *See, e.g., Id.* at 688–89; *Ballou Brick*, 798 F.2d at 342; *Tama Meat Packing Corp. v. NLRB*, 575 F.2d 661, 662 (8th Cir.1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979). In this case, Martin never discussed any of the purported reasons with Shell before discharging her. He never asked her about the problems with Miloshewski, never questioned her about the call from Stinger, and never discussed the highlighted memo with her. Moreover, he never warned or reprimanded her about these incidents before firing her. The only reprimand that Shell ever received while working at Wilson was the one she received for calling the union.

■■■■ The Board further found that Ruth Shell's poor attitude was caused by Martin's interrogation and reprimand. An "employer may not rely on employee conduct that it has unlawfully provoked as a basis of disciplining an employee." *NLRB v. Vought Corp.*, 788 F.2d 1378, 1384 (8th Cir.1986). "'The standard is whether [the employee's] improper conduct was so indefensible as to forfeit the Act's protection.'" *Id.* (quoting *NLRB v. Max Factor and Co.*, 640 F.2d 197, 205 (9th Cir.1980), *cert. denied*, 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 840 (1981)). The Board's conclusion that any poor attitude demonstrated by Ruth Shell was provoked by the reprimand is supported by substantial evidence. Before the reprimand, there had been no complaints concerning Ruth Shell's attitude or her relations with co-workers. In fact, Shell and Miloshewski had been good

friends. Moreover, Shell's reaction to the reprimand was not so indefensible as to remove the Act's protection. This case is not one where an employee reacted to discipline by cursing or threatening a supervisor, *cf. Precision Window Mfg., Inc. v. NLRB*, 963 F.2d 1105 (8th Cir.1992); rather, Shell merely ceased speaking to her supervisor.

Accordingly, having found that Ruth Shell's phone call to the union constituted concerted activity, that Wilson knew that the activity was concerted, that the concerted activity was protected, and that the concerted activity was a motivating factor in the interrogation, reprimand, and discharge of Ruth Shell, we hold that Wilson's various retaliatory actions constituted unfair labor practices in violation of section 8(a)(1) of the Act.

### B. Section 8(a)(3) Violations.

▮ The Board found that Wilson also violated section 8(a)(3) by reprimanding and discharging Ruth Shell for calling the union. An employer's retaliatory conduct against protected concerted activity violates both section 8(a)(1) and section 8(a)(3) if the retaliatory conduct discouraged union activity.[2] Put differently, to establish a prima facie violation of section 8(a)(3), General Counsel must show that antiunion animus was a motivating factor in the employer's decision to discharge or otherwise discipline an employee. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 395, 401–02, 103 S.Ct. 2469, 2471, 2474, 76 L.Ed.2d 667 (1983). As with a section 8(a)(1) violation, if General Counsel has met its burden, the burden shifts to the employer to demonstrate that it would have reached the same decision even if the employee had not been involved with the union. *Id.*

Wilson argues that the Board erred in finding that the company violated section 8(a)(3) because General Counsel failed to show that Ruth Shell's reprimand and discharge were motivated by antiunion ani-

mus or that it discouraged union activity. We disagree. As soon as Martin learned that Ruth Shell had called the union, he went to her office to interrogate and reprimand her. He told her not to call the union again or she would be fired. Martin admitted that he did not reprimand Shell for making a personal phone call during working hours. Although Martin testified that the fact that it was the union that Shell had called was irrelevant to his decision, he also testified that "[i]t was the aspect of involving herself in my department without verification and involving a third party at that time" that caused him to reprimand Shell for the phone call to the union. The reprimand and discharge had the potential to chill union activity. Several warehouse employees learned that Ruth Shell had been reprimanded and terminated after she had called the union, information that would make these employees less likely to contact the union themselves. We therefore find that General Counsel established a prima facie section 8(a)(3) violation. Having already rejected Wilson's affirmative defense for the reprimand and discharge, we need not consider it again. Accordingly, we hold that Wilson violated section 8(a)(3) by reprimanding and discharging Ruth Shell.

### III.

Last, we consider whether Wilson violated section 8(a)(1) by prohibiting its employees from engaging in wage discussions and from opening their paychecks in its warehouse. As Wilson concedes, an unqualified rule barring wage discussions among employees without limitations as to time or place is presumptively invalid under the Act. *See, e.g., Jeannette Corp. v. NLRB*, 532 F.2d 916, 918–19 (3d Cir.1976). Wilson argues, however, that an employer may "adopt and enforce a rule prohibiting employee wage discussions during working time." *Id.* at 919. Under this framework, Wilson contends that warehouse supervisor Wall's announcement at the all-men's meeting was a reasonable restriction on unnec-

---

**2.** Section 8(a)(3) provides that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3).

essary discussions during working time rather than an unqualified prohibition of wage discussions. Citing Wall's testimony, Wilson contends that Wall's statement restricted only inter-department visits during working time and side-by-side discussions that disrupted production or raised safety concerns—regardless of the subject-matter of the visits and discussions.

▆▆▆ The ALJ, however, did not credit Wall's testimony concerning the prohibition of wages discussions in the warehouse. Finding no reason to reverse the ALJ's credibility determination, we must rely on the testimony of Jeff Shell and John Miller. According to them, Wall told the men that there would be no more wage discussions in the warehouse. Wall's announcement presumably banned employee wage discussions during breaks, during lunch time, in the restroom, and before and after work while employees were in the warehouse. In short, the announcement banned wage discussion at times and places where such discussions could not affect productivity or safety. *Id.* We therefore affirm the Board's finding that Wall's prohibition against wage discussions constituted an unfair labor practice under section 8(a)(1).

Wilson also challenges the Board's finding that it violated section 8(a)(1) by prohibiting employees from opening their paychecks in the warehouse. This violation occurred in September of 1991 when Wall told an employee not to open his paycheck in the warehouse or he would be fired. Several employees heard Wall's reprimand. Wilson does not argue that this ban on opening checks did not violate the Act; rather, it attacks the Board's finding on two other grounds.

▆▆▆ First, Wilson argues that General Counsel failed to establish that Wall's announcement was made within the scope of his authority. We do not agree. Wilson stipulated that Wall was a statutory supervisor. Under section 2(11) of the Act, a supervisor is "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them," if the exercise of such authority requires independent judgment. 29 U.S.C. § 152(11). Even without the stipulation, the record clearly demonstrates that Wall hired employees, supervised them, and had the authority to fire or otherwise discipline them. In the light of these circumstances, we find that Wilson's argument that Wall lacked the authority to make the statement borders on the frivolous.

▆▆▆ Second, Wilson argues that Wall's statement did not constitute an unfair labor practice because Wall subsequently retracted it. In October 1991, Wall informed the reprimanded employee that he could open his check in the warehouse. As Wilson correctly notes, under certain circumstances an employer may relieve itself of liability for unlawful conduct by repudiating the conduct. *See, e.g., NLRB v. Intertherm, Inc.,* 596 F.2d 267, 276 (8th Cir.1979); *Passavant Memorial Area Hospital and Health Care Local Union No. 1401,* 237 N.L.R.B. 138, 138 (1978). To be effective, however, the repudiation must be timely and unambiguous, and specifically address the unlawful conduct. *Id.* Additionally, the employer must adequately publicize the repudiation to all employees involved. *Id.* Last, the repudiation should assure the employees that the employer will not interfere with their protected rights in the future. *Id.*

▆▆▆ Measured against these requirements, the repudiation was insufficient to erase Wilson's unlawful conduct. The retraction was not timely. Although Wall reprimanded the employee in September, he did not tell the reprimanded employee that he could open his paycheck in the warehouse until several weeks later. *Cf. Intertherm,* 596 F.2d at 276 (finding that a repudiation two days after unlawful conduct was timely); *Colson Corp. v. NLRB,* 347 F.2d 128, 137 (8th Cir.) (finding that a repudiation three weeks after unlawful conduct was inadequate), *cert. denied,* 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965). Tellingly, the repudiation occurred only after General Counsel had amended its complaint to include this violation. In

addition, the retraction was not adequately publicized. Wall told only the reprimanded employee that he could open his check in the warehouse. Wall never directly informed any other employees that they could open their checks in the warehouse, even though he knew that many employees believed that they were not permitted to do so. Wall could have announced his retraction at a warehouse employee meeting or posted a notice for all employees to read. Finally, Wall's repudiation failed to assure the employees involved that Wilson would not reimplement such a ban in the future.

Wilson's petition for review is denied. The Board's order is enforced.