No. 95-1729

David Carroll,                          *
                                        *
        Petitioner,                     *
                                        *
            v.                              *
                                            *
United States Department                *       Petition for Review of an
of Labor;                               *       Order of the United States
                                        *       Department of Labor
        Respondent,                      *
                                        *
Bechtel Power Corporation,              *
                                        *
        Intervenor.                      *

_____

Submitted:  November 15, 1995

Filed:  March 5, 1996

_____

Before McMILLIAN, FLOYD R. GIBSON, and LOKEN, Circuit Judges.

_____

FLOYD R. GIBSON, Circuit Judge.

David Carroll petitions for review of the Secretary's final order dismissing his complaint filed under the whistleblower provisions of the Energy Reorganization Act, 42 U.S.C. § 5851 (1988) (ERA).  We affirm.

## I. BACKGROUND

David Carroll was hired by Bechtel Corporation in July of 1989 as a mechanical engineer.  Carroll worked on a variety of Bechtel projects throughout the United States until July of 1990 when he was transferred to Bechtel's Engineering Support Team (EST) in

Russelville, Arkansas. The EST had been established in 1987 to supply Arkansas Power & Light Company (AP&L) and its agent, Entergy Operations, Inc. (Entergy), with engineering support services for AP&L's nuclear power plant, Arkansas Nuclear One (ANO). Hugh Nugent was the Bechtel EST Project Engineer who supervised James Drasler, who in turn supervised Carroll and the other engineers on the EST team.

In July of 1990, Bechtel contracted with Entergy to establish the Backlog Elimination Project (BEP). The purpose of the BEP was to review and respond to a backlog of outstanding engineering action requests (EARS) and plant engineering action requests (PEARS). This backlog consisted of over 2,000 internal engineering requests that had been previously screened by ANO personnel and determined not to present safety concerns. Entergy's BEP project manager then screened the backlog a second time and prioritized those EARS and PEARS that presented potential safety issues before sending the remainder to the BEP project. William Watson was the project manager for all Bechtel work performed for ANO, and in charge of both the EST and the BEP.

In late 1990, Entergy informed Bechtel that it would have to reduce its EST staff. Consistent with Bechtel's policy of retaining its most qualified engineers on ongoing projects, Bechtel "released" Carroll and Jon Rourke as well as eleven other engineers from the EST in December of 1990.[1] Because of attrition in the BEP, Carroll and Rourke were reassigned to that unit in January of

---

[1]"Release" is a term of art at Bechtel. Individual engineers are assigned to a regional home office for administrative purposes. When an engineer is released from a project, his home office is notified and the regional chief engineer for that regional office is responsible for reassignment of that engineer at other Bechtel worksites if such positions are available and if that engineer meets the relevant job qualifications. Carroll was assigned to the Houston, Texas regional home office, and George Showers was the chief project engineer for that office.

1991. Dale Crow, the Bechtel BEP project engineer, supervised David Christiansen, who in turn supervised Carroll on the BEP.

On April 5, 1991, Entergy ordered Watson to reduce the remaining EST mechanical engineering staff from three to one. Pursuant to Watson's directive "to look at all the people being released and retain those individuals with the highest skill level within the department," Nugent and Crow agreed to transfer mechanical engineers John Antle and Joel Guzman from the EST to the BEP and release Carroll and Rourke. Carroll's regional chief engineer, George Showers, notified him that he was being released from the BEP on April 10. Efforts to reassign Carroll were unsuccessful, and Showers told Carroll that he would be terminated effective May 10, 1991.

On the day he was terminated, Carroll filed a complaint with the Nuclear Regulatory Commission. Three days later, Carroll filed a complaint with the United States Department of Labor claiming that he had been released from the BEP and subsequently terminated in retaliation for voicing safety-related complaints to his supervisors. A hearing was held before an Administrative Law Judge (ALJ), who issued a decision on September 21, 1992, recommending dismissal of Carroll's claim. On February 15, 1995, the Secretary issued a final order dismissing Carroll's complaint. Although the Secretary's order disagreed with several aspects of the ALJ's decision, it adopted the ALJ's ultimate conclusion: that Carroll failed to prove by a preponderance of the evidence that he was retaliated against by Bechtel for engaging in activity protected by the ERA's whistleblower provision. Carroll now seeks review in this Court pursuant to 42 U.S.C. § 5851(c).

## II. DISCUSSION

The Energy Reorganization Act of 1974 protects "whistleblowers" employed in the nuclear power industry by

providing that "[n]o employer . . . may discharge any employee . . . because the employee . . . commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act." 42 U.S.C. § 5851(a)(1). Carroll attacks the Secretary's final order on two fronts: first, he argues that the Secretary failed to apply the proper legal standards to his complaint; second, he argues that the Secretary's conclusion that he failed to prove retaliatory discharge is unsupported by substantial evidence. Under the Administrative Procedure Act, we will set aside the Secretary's order only if it is unsupported by substantial evidence or is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706 (1994).

## A. ERRORS OF LAW

Carroll first argues that the Secretary's order dismissing his complaint is arbitrary and capricious because it failed to apply the rules of law articulated in Couty v. Dole, 886 F.2d 147 (8th Cir. 1989), or Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274 (1977), to his complaint. Carroll argues that he would have prevailed had the Secretary properly applied this authority. We believe that Carroll misapprehends the applicable legal framework underlying the Secretary's order.

## 1. Couty v. Dole:

Couty v. Dole sets forth a burden-shifting framework similar to that adopted in the Title VII context in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Under Couty, a complainant in a whistleblower case may satisfy his initial burden of establishing a prima facie case of retaliatory discharge by proving: (1) engagement in protected activity; (2) defendant's awareness of plaintiff's engagement in protected activity; (3) plaintiff's subsequent discharge; and (4) that the discharge

4

followed the protected activity so closely in time as to justify an inference of retaliatory motive. Id. at 148. The burden of production then shifts to the employer to "articulate[] a legitimate, nondiscriminatory reason for discharging [the complainant]." Id.

But once the employer meets this burden of production, "the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 (1981) (applying McDonnell Douglas test) (footnote omitted); see also St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2747 (1993) (applying McDonnell Douglas test). The Couty/McDonnell Douglas framework and its attendant burdens and presumptions cease to be relevant at that point, Hicks, 113 S. Ct. at 2749, and the onus is once again on the complainant to prove that the proffered legitimate reason is a mere pretext rather than the true reason for the challenged employment action. Burdine, 450 U.S. at 256. While Couty allows the complainant to shift the burden of production to the employer by establishing a prima facie case, the ultimate burden of persuasion remains with the complainant at all times. Hicks, 113 S. Ct. at 2747; Burdine, 450 U.S. at 253.

Assuming Carroll established a prima facie case under Couty, Bechtel met its burden of production by articulating a legitimate nondiscriminatory reason for releasing and subsequently terminating Carroll: a general decline in available work for which Carroll was qualified coupled with a policy of retaining more highly-qualified engineers. At that point, the issue of whether or not Carroll had previously established a prima facie case under Couty became irrelevant. "The presumption [of retaliatory discharge created under the Couty factors], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." Hicks, 113 S. Ct. at 2749. Once the employer has met its burden of production, "the trier of fact proceeds to decide

5

the ultimate question."  Id.  As such, we conclude that the Secretary's order properly focused on whether Carroll proved by a preponderance of the evidence that Bechtel had retaliated against him for engaging in protected conduct rather than whether Carroll had articulated a prima facie case under Couty.[2]  Lockert v. U.S. Dept. of Labor, 867 F.2d 513, 519 n.2 (9th Cir. 1989).

    2. **Mt. Healthy:**

     We are similarly unable to fault the Secretary's order for failing to rely on the Supreme Court's decision in Mt. Healthy.  Whereas Couty and McDonnell Douglas provide the legal framework in pretext cases, Mt. Healthy and Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), channel the scope of our inquiry in mixed motive cases.  Mt. Healthy and Price Waterhouse provide that where the employee has shown that the challenged employment action was motivated at least in part by an impermissible criterion, the burden then shifts to the employer to prove by a preponderance of the evidence that it would have reached the same decision even in the absence of the illegitimate factor.  Mt. Healthy, 429 U.S. at 287 (alleged discharge for exercise of free speech in violation of First Amendment); Price Waterhouse, 490 U.S. at 258 (Title VII claim).  This type of Mt. Healthy/Price Waterhouse mixed motive analysis, however, applies only in "dual motive" cases where the complainant produces "evidence that directly reflects the use of an illegitimate criterion in the challenged decision." Stacks v. Southwestern Bell Yellow Pages, Inc., 996 F.2d 200, 202 (8th Cir.

_____

     [2]In a related argument, Carroll asserts that he has so thoroughly discredited Bechtel's proffered nondiscriminatory reason for releasing and subsequently terminating him that the record can support nothing but a decision in his favor.  This argument has nothing to do with whether he has established a prima facie case under Couty, but raises the question of whether the Secretary's conclusion that Carroll failed to carry his ultimate burden of persuasion is supported by substantial evidence on the record as a whole.  We address this issue in the next section.

6

1993).  Direct evidence means evidence showing a specific link between an improper motive and the challenged employment decision.  Parton v. GTE N., Inc., 971 F.2d 150, 153 (8th Cir. 1992).  Here the record is bereft of any such direct evidence linking Carroll's release and termination to retaliation for his alleged engagement in protected activity.

Even if Mt. Healthy were applicable to the facts before us, this case has moved well past the issue of the adequacy of a party's prima facie showing under the Mt. Healthy/Price Waterhouse or the Couty/McDonnell Douglas analyses.  As previously observed in our discussion of the Couty/McDonnell Douglas framework, the Secretary's analysis, with the hindsight benefit of a full hearing before the ALJ, properly focused on the ultimate issue: whether, based on the record as a whole, Carroll proved by a preponderance of the evidence that Bechtel had retaliated against him for engaging in protected conduct.  See Finley v. Empiregas, Inc., 975 F.2d 467, 473 (8th Cir. 1992); Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1060 (8th Cir. 1993).

### B. SUBSTANTIAL EVIDENCE

The Secretary's final order concluded that Carroll had failed to prove that Bechtel retaliated against him for engaging in protected activity.[3]  Carroll contends that the factual findings underlying the Secretary's conclusion are unsupported by substantial evidence on the record as a whole.  In considering this issue, we consider the whole record before us, "including the ALJ's recommendation and any evidence that is contrary to the agency's determination."  Simon v. Simmons Foods, Inc., 49 F.3d 386, 389 (8th Cir. 1995).  Because the Secretary's opinion in this case is

---

[3]The Secretary's final order did not determine whether Carroll had in fact proved that he had engaged in any protected activity.  As such, we express no opinion on this issue.

in agreement with and based in part on the ALJ's credibility determinations, it is entitled to "great deference" by this Court. <u>Wilson Trophy Co. v. NLRB</u>, 989 F.2d 1502, 1507 (8th Cir. 1993). By substantial evidence, we mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quotation omitted).

The Secretary found that Bechtel released Carroll from the BEP for a combination of valid business reasons. This finding is supported by substantial evidence. It is uncontroverted that Entergy dictated Bechtel's staff levels for Entergy projects. It is also uncontroverted that Entergy ordered Bechtel to cut the number of engineers employed on the EST from three to one. It is further uncontroverted that, consonant with Bechtel's established policy of retaining its most highly-skilled engineers on ongoing projects, Carroll's superiors agreed to transfer Antle and Guzman from EST to the BEP to replace Carroll and Rourke. There is also substantial evidence that Carroll's replacement, Antle, was a more highly-qualified engineer. Unlike Carroll, Antle was a licensed nuclear reactor operator who possessed a bachelor of science degree in nuclear engineering and had worked in the nuclear field since 1969. James Drasler, Antle and Carroll's former EST supervisor, testified that Antle's qualifications, experience, and evaluations were deemed superior to those of Carroll, who was rated in the lowest quarter of all grade 25 engineers. Drasler's testimony is buttressed by the undisputed fact that in the face of prior mandatory personnel reductions, Carroll and Rourke were released from the EST and transferred to the BEP prior to Antle or Guzman, who were the last EST engineers to be released. This fact, coupled with Bechtel's policy of retaining its most highly-qualified engineers on ongoing projects, is compelling evidence that Bechtel did indeed consider Antle and Guzman more highly-qualified than Carroll or Rourke.

8

The Secretary also found that Carroll's subsequent termination was due to a lack of alternative job options despite Bechtel's substantial efforts to relocate him.  This finding is likewise supported by substantial evidence.  George Showers, Carroll's regional chief project engineer, James Drasler, Carroll's former EST supervisor, and Dale Crow, Carroll's BEP supervisor, all testified that they had made considerable efforts to match Carroll with an available position for which he was qualified.  These efforts were confirmed by testimony from Bechtel employees from other regional offices.  Showers, Drasler, and Crow all testified that they were unable to find a position for which Carroll was qualified due to overstaffing and a decline in the amount of contracts.  This testimony was similarly confirmed by testimony from other Bechtel employees from other regional offices and various Bechtel jobsites around the United States.

The Secretary additionally found that Bechtel did not retaliate against Carroll by terminating him instead of offering him the option of going on "holding" status.  This finding is also supported by substantial evidence.  Although Bechtel's written policy gives a chief regional engineer the option of placing a released employee on non-paid or "holding" status for up to three months, both Drasler and Robert Hobbs, a Bechtel senior designer, testified that this policy is purely discretionary.  Showers offered uncontroverted testimony that he had never placed an employee on holding status, that he did not offer holding status to three other mechanical engineers terminated around the same time as Carroll, and that as a matter of policy he would not offer holding status to engineers, such as Carroll, ranked in the lower third of their grade.

Carroll argues that the Secretary's order is not supported by substantial evidence on the record as a whole, citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88 (1951).  In support of this assertion, Carroll's brief bombards us with numerous excerpts

9

from the record which he claims constitute substantial evidence that he was in fact retaliated against for voicing nuclear safety concerns. Once again, Carroll misunderstands the nature and scope of our review. Universal Camera merely stands for the well-accepted proposition that the reviewing court is required to take the whole of the record into account in determining the substantiality of the evidence. Id. at 488. It does not require the reviewing court to displace the Secretary's choice "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Id.

As such, the issue here is whether substantial evidence supports the Secretary's conclusion, not whether substantial evidence exists to support Carroll's alternative view. Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992) ("The court should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence."). As long as an agency has correctly applied the law and its factual determinations are supported by substantial evidence on the record as a whole, we will affirm its decision "even though we might have reached a different decision had the matter been before us de novo." Wilson Trophy Co., 989 F.2d at 1507. It is clear from the Secretary's order that the Secretary painstakingly evaluated the whole of the substantial record in this case. The mere fact that the Secretary elected to disbelieve whatever evidence there may have been supporting Carroll's position does not mean that he was unaware of it. Accordingly, we conclude that the Secretary's decision was supported by substantial evidence on the record as a whole.

**III. CONCLUSION**

For the aforementioned reasons, we affirm the Secretary's final order dismissing Carroll's case.

10

A true copy.

Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.