# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-1862

_____

| | |
|---|---|
| Midwest Precision Heating and Cooling, Inc.; Midwest Heating and Air Conditioning, Inc., | * * * * |
| | * |
| Petitioners, | * * |
| | * |
| v. | * * |
| | * |
| National Labor Relations Board, | * * |
| | |
| Respondent. | * |

_____

No. 04-2056

_____

On Petition for Review of an Order of the National Labor Relations Board.

| | |
|---|---|
| National Labor Relations Board, | * * |
| | * |
| Petitioner, | * * |
| | * |
| v. | * * |
| | * |
| Midwest Precision Heating and Cooling, Inc.; Midwest Hearing and Air Conditioning, Inc., | * * * |
| | * |
| Respondents. | * |

_____

Submitted: January 10, 2005
Filed: May 19, 2005

_____

Before SMITH, HEANEY, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

In this appeal from the National Labor Relations Board ("NLRB"), Midwest Heating and Air Conditioning, Inc. ("Midwest Air Conditioning") seeks reversal of two NLRB rulings: (1) that Midwest Air Conditioning was the alter ego of Midwest Precision Heating and Cooling ("Precision") and (2) that Midwest Air Conditioning violated the National Labor Relations Act, specifically, 29 U.S.C. §§ 158(a)(1), (3), and (5). Finding no error, we affirm.

I. *Background*

A. *Factual Background*

This case turns on the origins and management relationships of three companies: Precision, Midwest Air Conditioning, and Midwest Heating and Cooling. For many years, William Lambert was the sole owner and principal manager of both Precision and Midwest Heating and Cooling. However, William Lambert's sons, John, Jack, and Jeff Lambert, were heavily involved in their father's businesses.

Precision installed heating and air-conditioning equipment primarily for builders of new residential construction in Kansas City, Missouri. For two decades, Precision and Sheet Metal Workers International Association, AFL-CIO ("the Union") had been parties to a series of collective-bargaining agreements that covered Precision's manufacturing, fabricating, installation, repairing, and servicing employees. The most recent collective-bargaining agreement between Precision and the Union was effective from July 1, 1999 to June 30, 2002. Midwest Heating and Cooling was a nonunion company that serviced, maintained, and replaced heating and air-conditioning units. Midwest Heating and Cooling operated out of the second floor

of the building that housed Precision and was managed by Jack Lambert. Midwest Air Conditioning was established in 1999 and is owned by John and Jack Lambert.

In the mid-1990s, John Lambert and his brother Jeff Lambert began assuming managerial duties at Precision. Jeff Lambert managed the shop and served as a corporate officer. John Lambert, along with William Jones, also served as corporate officers, bid jobs for Precision, and assigned employees work. In late 1997 or early 1998, William Lambert retired, although he would come into the office a few mornings a week. John Lambert began using his father's desk, and by 1999, certain Precision documents identified John Lambert as Precision's president. In March 1999, William Lambert was involved in a serious automobile accident and was unable to actively participate in the management of Precision. With William Lambert incapacitated, John Lambert and William Jones assumed total responsibility for Precision.

In July 1999, John Lambert, while still managing Precision, incorporated Midwest Air Conditioning. However, the new company did not hire any employees or perform any services for any clients in 1999. During that time, John Lambert continued running and remained president of Precision. According to John Lambert, he started his own business because he feared his father would never let him gain complete control of Precision. By January 2000, John Lambert convinced Jack Lambert, to become joint owner of Midwest Air Conditioning.

Later that month, William Lambert agreed to sell his two businesses, Precision and Midwest Heating and Cooling, to Midwest Air Conditioning.[1] The sales occurred in separate transactions. First, on January 12, 2000, the day after John Lambert resigned his employment with Precision, William Lambert sold Midwest Heating and Cooling to Midwest Air Conditioning for $20,000.00. After purchasing the assets,

---

[1]At that time, William Lambert was diagnosed with cancer.

Midwest Air Conditioning hired Midwest Heating and Cooling's nonunion employees and, without any hiatus, continued Midwest Heating and Cooling's business from the same location.

Second, on January 31, 2000, John Lambert and William Lambert signed an asset purchase agreement, whereby Midwest Air Conditioning agreed to purchase the assets of Precision. The agreement was drafted by Precision's attorney and the purchase price was for $412,107.00. This price was set by Precision's accountant, as Midwest Air Conditioning did not have separate legal or accounting representation. The asset purchase agreement called for Midwest Air Conditioning to execute a promissory note payable to Precision for $412,107.00 plus interest, payable at the rate of $5,000.00 per month over 10 years. The agreement further provided that in the event of William Lambert's death, all obligations of the promissory note would be deemed to be satisfied in full.[2] The asset purchase agreement also provided that Midwest Air Conditioning was not a signatory to any collective bargaining agreement and did not intend to become signatory to any collective bargaining agreement. Midwest Air Conditioning also renounced any obligation or intent to hire Precision's union members/employees.

Precision remained in business after the asset purchase and entered into a lease-back agreement with Midwest Air Conditioning, whereby Midwest Air Conditioning agreed to lease back to Precision certain equipment and supplies that Precision previously had sold to Midwest Air Conditioning. Precision obtained any additional supplies it needed from Midwest Air Conditioning because Precision lacked a line of credit. In addition, Jeff Lambert continued to run Precision's shop and William Jones continued to serve as a manager. John Lambert continued to occupy the same first floor Midwest Precision office he occupied prior to forming Midwest Air

_____

[2]In January 2001, William Lambert lost his battle with cancer and Midwest Air Conditioning stopped making payments to Precision pursuant to the terms of the promissory note and the asset purchase agreement.

-4-

Conditioning and purchasing the assets of Midwest Heating and Cooling and Precision. John Lambert continued to assign Precision employees work, continued to grant Precision employees time off, and continued serving as a contact person for Precision's builder clients. In April 2000, Midwest Air Conditioning identified John Lambert as Precision's president, despite the fact that he resigned from Precision earlier that year.

In early spring of 2000, nonunion employees of Midwest Air Conditioning began performing work for Precision that was covered under Precision's collective-bargaining agreement with the Union. An employee of Precision, Thomas Troy Hutton ("Hutton"), complained to John Lambert about using nonunion employees to perform Precision's work. John Lambert responded by offering Hutton a nonunion position with Midwest Air Conditioning with a $2.00 per hour wage increase, a newer company van, a helper, and paid vacations and holidays. Hutton accepted and began working for Midwest Air Conditioning that very day, doing the same work that he had done for Precision.

In the summer of 2000, Precision employee Walter Eastwood ("Eastwood"), informed John Lambert that he would be quitting in two weeks. John Lambert and William Jones then told Eastwood that they would give him more money to stay and work for Midwest Air Conditioning, and offered him $21.00 per hour. Eastwood did not accept the offer at that time. A few days later, John Lambert told Eastwood that if Eastwood would work for his new nonunion company, he would pay Eastwood $23.00 per hour and provide him with full benefits. Eastwood initially accepted this offer; he later declined to join Midwest Air Conditioning.

Under the terms of its collective-bargaining agreement with the Union, Precision was obligated to raise its employees' wages by $2.00 per hour in July 2000. On the morning of July 28, 2000, Precision faxed a letter to the Union announcing

that Precision was closing that very day and discharging all the unit employees. Precision's letter stated as follows:

> As of this date, Precision Heating and Cooling, Inc. has determined that it is necessary to cease doing business. We have been compelled to terminate all of our employees, which of course, includes members of your union. We will, in accordance with our obligations under the collective bargaining agreement, submit the necessary fringe benefit information and a check depositing the same. *It is unfortunate that Midwest Air Conditioning found it was simply unable to compete with other residential companies because of the union wage structure.* Midwest Air Conditioning was further impacted due to the union being unable to provide qualified personnel for the shop. The combinations [sic] of these two items have caused Midwest Air Conditioning to cease doing business. Unfortunately, there will be no one employed, even in management, after July 31, 2000; therefore, if you have any questions, please direct them to our legal counsel, Thomas Moore. (Emphasis added.)

That same morning, William Jones and Jeff Lambert called Precision's union employees into John Lambert's office and told them that they were discharged. Many of the former employees were then offered jobs at Midwest Air Conditioning. Some of the Precision employees agreed to work nonunion for Midwest Air Conditioning. Other union employees refused to work nonunion either that day or shortly thereafter. Those who accepted the offer were hired that very day to perform the same jobs they performed for Precision.

That same day, John Lambert also hired his brother Jeff Lambert to manage the shop for Midwest Air Conditioning, just as he had done for Precision. William Jones was hired to perform the same duties for Midwest Air Conditioning that he had formerly performed for Precision. Operating from the same facility that had formerly housed Precision, Midwest Air Conditioning then finished the work that Precision

-6-

had yet to complete when it closed. On August 1, 2000, Midwest Air Conditioning sent the following letter to Precision's customers:

Dear Valued Customer,

We are writing this letter to inform you of some changes that are taking place in our business. As of this date, Precision will no longer be in business. After a long and difficult decision process, it has become necessary to close the doors on that business. *The difficulties of remaining competitive with the ever increasing union pay scale and the inability of the union to provide us with help has made this necessary.* Through retirement and attrition the union journeymen's numbers have dropped to seven men. While we will miss the skills and contributions they have made, we feel we have built up the staff of Midwest Heating and Air Conditioning to offset this loss. We will continue to provide you with all your HVAC needs.

. . .

Respectfully submitted,
John Lambert
Midwest Heating and Air Conditioning, Inc.
(Emphasis added.)

Thereafter, Midwest Air Conditioning took out an advertisement claiming that it had been serving the Kansas City metropolitan area for 39 years. Later, Midwest Air Conditioning held a sale celebrating its 40th year in business.

In an August 14, 2000 letter addressed to Precision's attorney, Thomas Moore, the Union's counsel acknowledged that the Union had received Midwest Air Conditioning's July 28, 2000 fax announcing the discharge of all the union employees and the closure of Precision. The Union requested bargaining and various information, but Midwest Air Conditioning never responded.

Midwest Air Conditioning retained all, or substantially all, of Precision's residential builder customers. Midwest Air Conditioning also used the same equipment that Precision used, although Midwest Air Conditioning had purchased some additional equipment. Midwest Air Conditioning continued to use fifty-nine of the sixty-one Precision suppliers. Midwest Air Conditioning kept Precision's phone number and used the same accountant, lawyer, and payroll provider that Precision used. In addition to performing new residential HVAC work in the same manner as Precision, Midwest Air Conditioning also performed the service, maintenance, and replacement HVAC work that nonunion Midwest Heating and Cooling performed.[3] Midwest Air Conditioning had not abided by Precision's collective bargaining agreement, but had credited the Precision employees it hired with their Precision seniority.

## B. *Procedural Background*

Based upon an unfair labor practice claim filed against Midwest Air Conditioning by the Union, the NLRB issued a complaint alleging that Precision and Midwest Air Conditioning were alter egos and that Midwest Air Conditioning committed a variety of unfair labor practices in violation of the National Labor Relations Act. The administrative law judge ("ALJ") found that Precision and Midwest Air Conditioning were alter egos. On appeal, the NLRB affirmed the ALJ and also found, as had the ALJ, that Midwest Air Conditioning committed five violations of the National Labor Relations Act, specifically 29 U.S.C. §§ 158(a)(1), (3) and (5), in that they: first, wrongfully discharged Precision's union-represented employees; second, offered the wrongfully discharged employees jobs (still

___

[3]As of fall 2000, seventy-five percent of Midwest Air Conditioning's business comprised the new residential HVAC work that Precision formerly performed. About twenty-five percent of Midwest Air Conditioning's business was the service, maintenance, and replacement work that nonunion Midwest Heating and Cooling had performed. As of June 2001, sixty to seventy percent of Midwest Air Conditioning's business was new residential HVAC work, and thirty to forty percent was service, maintenance, and replacement work.

performing bargaining-unit work) with Midwest Air Conditioning on the condition that there would be no union and no collective-bargaining agreement; third, repudiated the applicable collective-bargaining agreement; forth, refused to bargain with the Union; and fifth, bypassed the Union as the exclusive representative of the unit employees and dealt directly with employees over terms and conditions of employment.

The NLRB's order required Midwest Air Conditioning to cease and desist the unfair labor practices and further refrain from interfering with, restraining or coercing employees from exercising their rights under the National Labor Relations Act. Affirmatively, the NLRB's order required Midwest Air Conditioning to offer the unlawfully discharged Precision employees immediate and full reinstatement to their former jobs or, if those jobs no longer existed, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges previously enjoyed, and to make them whole for any loss of earnings or other benefits suffered as a result of the unlawful discrimination against them. The NLRB's order also required Midwest Air Conditioning to make whole employees who performed bargaining-unit work for Midwest Air Conditioning on and after March 1, 2000, for any losses suffered as a result of Midwest Air Conditioning's unlawful failure to abide by the terms of the 1999 collective-bargaining agreement between Precision and the Union. The NLRB's order further required Midwest Air Conditioning to recognize and bargain with the Union as the exclusive representative of the unit employees, and to continue in force and effect the collective-bargaining agreement. Finally, the NLRB's order required Midwest Air Conditioning to post an appropriate notice.

Midwest Air Conditioning seeks reversal of the NLRB's ruling that they are the alter ego of Precision and thus violated the National Labor Relations Act.

## II. *Discussion*
### A. *Standard of Review*

We review the NLRB's findings of fact to determine if they are supported by substantial evidence on the record as a whole. *Wilson Trophy Co. v. NLRB,* 989 F.2d 1502, 1507 (8th Cir. 1993); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp.,* 340 U.S. at 477 (citation omitted). Although NLRB decisions are given deference, enforcement is not presumed. *Id.* at 490. We examine the entire record and evaluate the NLRB's decision taking "into account whatever in the record fairly detracts from its weight." *Id.* at 488. The ALJ's credibility determinations are to be considered with the NLRB's factual findings under the substantial evidence test. *Town & Country Elec., Inc. v. NLRB,* 106 F.3d 816, 819 (8th Cir. 1997). We weigh the NLRB's findings against the countervailing evidence independent of and consistent with its credibility determinations. *NLRB v. Fruin-Colnon Constr. Co.,* 330 F.2d 885, 889–90 (8th Cir. 1964). While we are prohibited from substituting our judgment for that of the NLRB, we are not bound by the NLRB's conclusions when the NLRB's conclusions go beyond what good sense permits. *Local Union No. 948, IBEW v. NLRB,* 697 F.2d 113, 117–18 (6th Cir. 1982).

The NLRB's findings of fact are conclusive if they are supported by substantial evidence on the record as a whole. *Wilson Trophy Co.,* 989 F.2d at 1507. We may not "displace the Board's choice between two fairly conflicting views," even if we "would justifiably have made a different choice had the matter been before . . . [us] de novo." *Universal Camera Corp.,* 340 U.S. at 488. The NLRB's application of the law to particular facts is reviewed under the substantial evidence standard. *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 260 (1968).

B. *Alter Ego*

United States Code, Title 29, Section 158(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." Section 158(d) in turn provides that when a collective-bargaining agreement is in effect, "the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract." Accordingly, it is well settled that an employer violates 29 U.S.C. § 158(a)(1) and (5) by refusing to bargain with the union that represents its employees and by repudiating its collective-bargaining agreement with that union. *See generally Kirkwood Fabricators, Inc. v. NLRB*, 862 F.2d 1303, 1305–07 (8th Cir. 1988); *NLRB v. Campbell-Harris Elec., Inc.*, 719 F.2d 292, 295–96 (8th Cir. 1983); *NLRB v. Indep. Stave Co.*, 591 F.2d 443, 446 (8th Cir. 1979).

An employer also violates 29 U.S.C. § 158(a)(1) and (5) by bypassing its employees' exclusive bargaining representative and dealing directly with employees. *Buffalo Bituminous, Inc. v. NLRB*, 564 F.2d 267, 270–71 (8th Cir. 1977). As the Supreme Court has explained, "it is a violation of the essential principle of collective bargaining and an infringement of the Act for . . . [an] employer to disregard the bargaining representative [of its employees] by negotiating with individual employees." *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684 (1944). An employer cannot avoid its obligations under the Act merely by forming a new corporate entity when the newly formed entity is in reality only a "disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942). One business entity is bound by the collective bargaining agreement between another business entity and a union if the two business entities are alter egos. *Iowa Express Distrib., Inc. v. NLRB*, 739 F.2d 1305, 1311 (8th Cir. 1984). Accordingly, an employer violates 29 U.S.C. 158(a)(1) and (5) by repudiating the collective-bargaining agreement between its alter ago and the union, refusing to bargain with the union that represents its alter ego's employees, and bypassing that

-11-

union and dealing directly with employees. *See Campbell-Harris Elec., Inc.*, 719 F.3d at 295–96.

In determining whether two business entities are alter egos, the NLRB and the courts consider a variety of factors, including whether the two entities have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership. *Id.* at 295. We also consider whether a motive for the new entity's taking over of the operations of the old entity was to evade responsibilities under the Act and whether dealings between the two entities were at arm's length. *Woodline Motor Freight, Inc. v. NLRB*, 843 F.2d 285, 288–89 (8th Cir. 1988). However, we recognize "the test of alter ego status is a flexible one, such that lack of . . . [any particular factor] will not bar a finding of alter ego status." *Campbell-Harris Elec., Inc.*, 719 F.2d at 296. The NLRB's finding that two entities constitute alter egos is entitled to affirmance "if supported by substantial evidence on the record as a whole." *Id.* at 295.

The parties agree that Midwest Air Conditioning refused to bargain with the Union. The parties also agree that Midwest Air Conditioning repudiated Precision's collective-bargaining agreement with the Union. Additionally, Midwest Air Conditioning does not directly challenge the NLRB's finding that it bypassed the Union and dealt directly with Precision employees regarding the terms and conditions of employment they would enjoy if they went to work for Midwest Air Conditioning.

Midwest Air Conditioning's main argument on appeal is that it is not the alter ego of Precision, and therefore not bound by Precision's collective bargaining agreement with the Union. Midwest Air Conditioning relies on *Victor Valley Heating & Air Conditioning*, 267 NLRB 1292 (1983) and *First Class Maint. Serv.*, 289 NLRB 484 (1988) for support, but these cases are distinguishable and thus unavailing. Unlike the instant case, the new entities established in those cases were maintained as entirely separate entities that shared neither management nor supervision. *See*

*Victor Valley Heating & Air Conditioning*, 267 NLRB at 1296–98 & *First Class Maint. Serv.*, 289 NLRB at 485–86. The older businesses were continued as separate ongoing companies and there was no evidence that the new entities were set up to avoid the unions. *See Victor Valley Heating & Air Conditioning*, 267 NLRB at 1298 & *First Class Maint. Serv.*, 289 NLRB at 486.

The purchase of Precision's assets by Midwest Air Conditioning was not an arms length transaction. The agreements were drafted by Precision's attorney and the purchase prices were set by Precision's accountant, as Midwest Air Conditioning did not have separate legal or accounting representation. After the asset sale, John and Jack Lambert had sole control over Precision and continued to operate its business. Notably, the decision to shut down Precision's business was made by John Lambert, not by William Lambert. *See Best Mechanical Contractors, Inc.*, 273 NLRB 83, 84 (1984) (alter ego not found where decision to cease operation of old entity solely made by father, not sons who eventually purchased equipment and rented office space). Control over Precision and Midwest Air Conditioning after the asset purchase was not separate and distinct.

Before shutting down Precision, Midwest Air Conditioning commingled Precision's business and Midwest Air Conditioning's business. Since Precision has closed, Midwest Air Conditioning has kept all, or substantially all, of Precision's residential builder customers. Midwest Air Conditioning uses fifty-nine of the sixty-one Precision suppliers. Midwest Air Conditioning kept Precision's phone number in service, and still uses the same accountant, lawyer, and payroll provider that Precision used. In addition to performing new residential HVAC work in the same manner as Precision, Midwest Air Conditioning also performed the service, maintenance, and replacement HVAC work that Midwest Heating and Cooling performed. *See id.* (alter egos not found where new entity decided to seek smaller jobs that had been performed by existing business, which had been a large contractor that sought only major works).

Seventy-five percent of Midwest Air Conditioning's business comprised the new residential HVAC work that Precision formerly performed, and about twenty-five percent of Midwest Air Conditioning's business was the service, maintenance, and replacement work that nonunion Midwest Heating and Cooling had performed. Sixty to seventy percent of Midwest Air Conditioning's business was new residential HVAC work, and thirty to forty percent was service, maintenance, and replacement work. Midwest Air Conditioning did not abide by Precision's collective bargaining agreement, but did credit the Precision employees it hired with their Precision seniority.[4] Viewing the record as a whole, we hold substantial evidence supports the NLRB's finding that Midwest Air Conditioning is the alter ego of Precision.

## C. *National Labor Relations Act Violations*

In its brief, Midwest Air Conditioning also argued that there was not substantial evidence to support a finding that its offers of employment to union members Mark McMahon, Kevin Williams, Troy Hutton, Steve Todd, and Steve Groom were in violation of 29 U.S.C. §§ 158(a)(3) and (5). Midwest Air Conditioning also argued that substantial evidence did not support a finding that it violated 29 U.S.C. § 158(a)(5) in bypassing the Union and dealing directly with employees over terms and conditions of employment. However, at oral argument counsel for Midwest Air Conditioning conceded that if the ruling regarding alter ego status is upheld, there is no question that Midwest violated the National Labor Relations Act by dealing directly with employees. Because we affirm the finding of alter ego status, we also affirm the NLRB's findings that Midwest Air Conditioning violated the National Labor Relations Act.

---

[4]Midwest Air Conditioning attempts to make the argument that they were in competition with Precision and that Midwest Air Conditioning survived while Precision did not; substantial evidence shows that Midwest Air Conditioning did not perform any business until immediately before Precision ceased operations.

The judgment of the NLRB is affirmed.

———————————————————