Harley HALL d/b/a Hall Construction, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 90–1522.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1990.

Decided Aug. 12, 1991.

Courtney R. Clayborne, Rapid City, S.D., argued for petitioner, Ron W. Banks, Rapid City, S.D., on the brief.

John Mantz, Washington, D.C., argued, for respondent, Charles Donnelly and John Mantz, Washington, D.C., on the brief.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and ARNOLD,\* District Judge.

McMILLIAN, Circuit Judge.

Harley Hall d/b/a Hall Construction (the employer) petitions this court for review of a decision [1] of the National Labor Relations Board ("Board") finding the employer violated § 8(a)(1), (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) ("Act"), by laying off one employee and discharging another employee for engaging in protected activity. The Board has filed a cross-petition for enforcement of its order. The Board directed Hall to cease and desist, to post compliance notices and to offer to reinstate illegally discharged employees with full benefits and seniority. For reversal, the employer argues that the Administrative Law Judge's (ALJ) findings are not supported by substantial evidence in the record as a whole and that the ALJ was

---

\* The Honorable Morris S. Arnold, United States District Judge for the Western District of Arkansas, sitting by designation.

1. *Hall v. NLRB*, 297 N.L.R.B. No. 138 (June 28, 1990).

biased and partial in making his credibility assessments. For the reasons discussed below, we deny the petition for review and enforce the order of the Board.

## I. BACKGROUND FACTS

The employer is a sole proprietorship owned by Harley Hall. The employer does excavating, land clearing and road building in the western United States with headquarters in Lead, SD. During July 1988 the employer began performing construction services for the Golden Reward Mining Co. (Golden Reward) at a gold mine near Lead. The employer had two performance contracts with Golden Reward. The first contract involved earth-moving work and preparation for construction of the mine; the second involved removal of top soil and "overburden" and the hauling of ore to mechanical crushers. The mine was to be in production by December 1988.

The first draft of the performance contracts between the employer and Golden Reward required the employer's project to be "non-union." The final contracts did not contain this non-union provision, although the employer informed the employees otherwise.

The employer had been working at a mine in Wyoming in July 1988. The employer transferred some employees from the Wyoming site to the Golden Reward mine site and also hired some additional employees. In August 1988 the employees at the Golden Reward mine site became disgruntled about what they believed was mistreatment by supervisor Jeff Garrett and began to discuss unionization. In September 1988, Garrett interrogated and threatened employee John Jordan for discussing unionization.

Meanwhile, in August 1988, the employer hired Phillip LeMieux as a fill-in equipment operator. Fill-in equipment operators can operate more than one piece of equipment. LeMieux was considered by both his supervisors and fellow employees to be a capable and efficient operator. The employer paid LeMieux the highest rate among the newly hired operators at the Golden Reward mine site.

Until November 1988 the employer believed that he was going to meet the scheduled December 1988 completion date specified by the contract. It soon became evident that, despite much overtime, 6 days per week, 10 or more hours per day, the employer would not be able to complete the project as scheduled. Therefore, the opening date was revised to March 1 and then to May 25.

In November 1988, employees again began to discuss unionization. In mid-November 1988 LeMieux made inquiries at the local union hall, United Steelworkers of America, AFL–CIO. LeMieux agreed to talk to other employees about attending a union meeting on November 28. On November 18, LeMieux spoke to another employee, Lonny Mertz, as well as other workers at the Golden Reward mine site about the scheduled union meeting.

On November 21, Garrett again interrogated Jordan about union organization at the Golden Reward mine site. He derisively mentioned his suspicions about employees LeMieux and Mertz. On the same day, Garrett also questioned LeMieux. After LeMieux feigned ignorance of any union activity, Garrett warned LeMieux that organizing a union at the mine could cost LeMieux his job.

On November 22, Garrett once again interrogated LeMieux, naming Mertz as a union instigator and warning LeMieux that the employer was keeping record of union activities at the mine. The following day Garrett accused LeMieux of dishonesty and expressed his disappointment and the employer's anger with LeMieux for instigating union trouble. Thereafter, LeMieux acknowledged for the first time his interest in the union. Later that day, Garrett handed out paychecks to both Mertz and LeMieux and made derisive, anti-union comments to both, stating that he had a "surprise" for LeMieux. Garrett then informed LeMieux that he was being laid off for two weeks but that he could be called back. LeMieux, however, has never been called back.

Five days later LeMieux and Mertz attended the previously scheduled union meeting and received a packet of union authorization cards. Mertz was the only employee at the Golden Reward mine site who attended the union meeting; LeMieux had already been laid off.

On December 5, Garrett told Mertz to take a large bulldozer to the future site of a "crusher." Two mounds of solid stone, or "fingers," jutted out from the face of a hill at the site. Garrett instructed Mertz to "rip up" the fingers. Garrett stated that Mertz might not be able to accomplish this because of the difficulty of the job. Garrett told Mertz not to disturb any of the level ground at the foot of the hill because it was to be surveyed for future construction. Mertz excavated the site as instructed, producing twenty to forty truckloads of material. Eventually Mertz reached solid stone. As instructed, he idled his equipment rather than damage it on the solid stone. Mertz informed crew foreperson Delbert Boyd that he could not rip the solid stone at the site. Boyd summoned Garrett who then instructed Mertz to push loose material down the site to be picked up by the trucks. Mertz followed these instructions.

The next day, December 6, Mertz had left some union material in his car where three anti-union employees parked nearby could see it. The record indicates that these employees felt that unionization would cause the employer to close or sell the business—costing them their jobs. That afternoon Garrett questioned Mertz about the union meeting. In response to Mertz's affirmative answer, Garrett interrogated him about his union activity and threatened him.

After this encounter, the three anti-union employees complained to Garrett that the day before Mertz had not made a serious attempt to rip the stone. Garrett instructed Boyd to dismiss Mertz for lying. Garrett then went to the site to be surveyed, the site that he had instructed Mertz to avoid, and excavated that area. Garrett then showed supervisor Boyd the newly excavated area and claimed Mertz had lied about his inability to rip the area. Boyd dismissed Mertz for dishonesty. Boyd requested employees, including the three anti-union employees who made the complaint, to put their charges in writing to substantiate Mertz's discharge because he anticipated some controversy.

The ALJ found that the employer had violated § 8(a)(1) and § 8(a)(3) of the Act by laying off LeMieux and discharging Mertz for their union activities. Section 8(a)(3) forbids discrimination in regard to hire or tenure of employment to encourage or discourage membership in any labor organization. The ALJ also found that the employer had violated § 8(a)(1) of the Act by interrogating and threatening employees and creating the impression of surveillance of union activity. The ALJ found that the employer laid off LeMieux and discharged Mertz for their union activity and that the employer's reasons for each adverse action were pretextual. The Board affirmed the decision of the ALJ. The employer filed a petition for review; the Board filed a cross-petition for enforcement of its order.

The employer does not contest the ALJ's finding that the employer violated § 8(a)(1) of the Act by interrogating and threatening employees and by creating the impression of surveillance of union activities. An employer's interrogations of employees concerning union sympathies violate § 8(a)(1) if they coerce employees in the exercise of rights guaranteed by § 7 of the Act which provides in part that "employees shall have the right to self-organization, to form, join or assist labor organizations." Accordingly, the Board is entitled to summary enforcement of that part of its order. The employer does argue that the ALJ's findings that it laid off LeMieux and discharged Mertz in violation of § 8(a)(3) are not supported by substantial evidence in the record as a whole.

## II. STANDARD OF REVIEW

The court of appeals must enforce an order of the Board if the Board has correctly applied the law and its findings rest upon substantial evidence. *Universal*

*Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *see, e.g., NLRB v. American Postal Workers Union,* 618 F.2d 1249, 1254 (8th Cir. 1980) (*Postal Workers*). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See, e.g., GSX Corp. v. NLRB,* 918 F.2d 1351, 1356 (8th Cir.1990) (*GSX*) *citing Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938). Where either of two inferences may reasonably be drawn from the facts, the court of appeals is bound by the Board's findings even though the court could have made a different choice if the matter were before it *de novo.* Thus, great deference is afforded to the Board's affirmation of the ALJ's findings. *See, e.g., Radio Officers Union v. NLRB,* 347 U.S. 17, 49–52, 74 S.Ct. 323, 340–42, 98 L.Ed. 455 (1954); *Postal Workers,* 618 F.2d at 1254.

## III. DISCHARGE

 In an illegal discharge case the General Counsel must establish a prima facie showing to support the inference that the protected conduct was a motivating factor in the employer's decision. *See, e.g., GSX,* 918 F.2d at 1357; *York Products, Inc. v. NLRB,* 881 F.2d 542, 544 (8th Cir. 1989), *quoting Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083, 1088 n. 12 (1980), *enforced on other grounds,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). By asserting a legitimate reason for its decision and showing by a preponderance of the evidence that the legitimate reason would have brought about the same result even without the illegal motivation, an employer can establish an affirmative defense to the unlawful discharge charge. *GSX,* 918 F.2d at 1357. Here, the employer argues that LeMieux was laid off because of insufficient work and Mertz was discharged because of poor performance.

### A. Phillip LeMieux

 Conflicting testimony exists as to the circumstances of LeMieux's lay-off.

The employer asserts that he laid off LeMieux due to a lack of work and not because of union activities. The employer argues that the job was overstaffed and that a number of lay-offs were necessary to increase efficiency. The ALJ found, however, that at the time of LeMieux's lay-off, LeMieux and most of the construction crew were working ten hour days, six days a week, and the job was running months behind schedule. Additional delays followed LeMieux's lay-off. The ALJ found that the testimony of the employer and his supervisor about the reason for LeMieux' lay-off was contradictory and vague. Such implausible explanations and false or shifting reasons support a finding of illegal motivation. *See, e.g., York Products, Inc. v. NLRB,* 881 F.2d at 545; *McGraw–Edison Co. v. NLRB,* 419 F.2d 67, 75 (8th Cir.1969). The contradictory testimony must also be viewed in light of the anti-union animus displayed by the employer. As stated above, the employer does not contest violating § 8(a)(1) of the Act by interrogating and coercing employees for protected conduct. Inference of an employer's unlawful motive may be drawn from the employer's hostility toward the union. *See, e.g., Lemon Drop Inn, Inc. v. NLRB,* 752 F.2d 323, 325 (8th Cir.1985); *McGraw–Edison Co. v. NLRB,* 419 F.2d at 75. Considering that LeMieux was working overtime and the absence of any warnings of a pending lay-off, LeMieux' lay-off was sudden and inexplicable. The lack of any prior warning or reprimand is another factor which indicates that LeMieux's union activity was the cause of his lay-off. *See, e.g., NLRB v. Wal–Mart Stores, Inc.,* 488 F.2d 114, 117 (8th Cir.1973); *McGraw–Edison Co. v. NLRB,* 419 F.2d at 75. Indeed, the employer laid off LeMieux only after it learned that LeMieux had contacted the union and scheduled an organizational meeting. The timing of an adverse employment decision is given great weight in unlawful discharge cases as an indication of anti-union motive. *See, e.g., TLC Lines, Inc. v. NLRB,* 717 F.2d 461, 464 (8th Cir. 1983). The timing factor, together with the illegal interrogation and intimidation of LeMieux, and the employer's unsatisfac-

tory explanation of the necessity of his lay-off indicate that the employer unlawfully laid off LeMieux in violation of § 8(a)(3) and (1).

### B. Lonny Mertz

The employer claims that Mertz's discharge was based on problems with his job performance and that Mertz's union activities were not the motivating factor in the discharge decision. The employer argued that Mertz was discharged because he did not follow Garrett's directions at the ripping site.

 However, the employer's testimony concerning that incident is highly inconsistent and thus is subject to the inference of illegal motivation on the part of the employer. *See, e.g., York Products, Inc. v. NLRB*, 881 F.2d at 545; *McGraw–Edison Co. v. NLRB*, 419 F.2d at 75. Neither Garrett or Boyd questioned Mertz's performance at the ripping site that day. Criticism arose only after the complaints of anti-union employees the next day. Absence of previous warnings or reprimands to the employee may indicate an employer's unlawful motive. *See, e.g., Lemon Drop Inn, Inc. v. NLRB*, 752 F.2d at 325; *NLRB v. Wal–Mart Stores, Inc.*, 488 F.2d at 117. Both the timing of Mertz's discharge and the lack of any prior warning or reprimands support the ALJ's finding that anti-union sentiment was the underlying reason for his discharge. The record shows that after Mertz had attended the scheduled union meeting on November 28 (five days after LeMieux' lay-off) and had displayed union pamphlets and authorization cards in his Jeep, Garrett interrogated and intimidated Mertz for union activity. In the course of advising Mertz of the futility of establishing a union at the Golden Reward mine site, Garrett told Mertz that the employer would close down his business if the union established itself. Claims that unionization would result in closing the company are examples of illegal intimidation and coercion of employees. *See, e.g., South-wire Co. v. NLRB*, 261 U.S.App.D.C. 45, 820 F.2d 453, 457 (1987). Less than four hours after the coercive conversation, Mertz was summarily discharged. Coincidence between the employee's protected activities and the discharge also strongly supports an inference of illegal motive in the employer's decision. *See, e.g., Lemon Drop Inn, Inc. v. NLRB*, 752 F.2d at 325; *TLC Lines, Inc. v. NLRB*, 717 F.2d at 464.

For both LeMieux and Mertz, the record shows inconsistent and shifting reasons concerning the lay-off or discharge; lack of previous warnings or reprimands; chronological proximity between the employee's union activities and the lay-off or discharge; interrogation concerning the employee's union sentiments and activities coupled with a threat of physical harm if the employees unionized; and finally, a coercive anti-union atmosphere which included illegal questioning, surveillance and threatening of employees, as well as, in the case of Mertz, a prior discriminatory lay-off (LeMieux). Clearly, ample evidence supports the ALJ's findings that anti-union motivation was the underlying factor for LeMieux' lay-off and Mertz's discharge and that the employer's proffered reasons for the lay-off and the discharge were pretextual. Accordingly, we hold the ALJ's findings that the employer laid off LeMieux and discharged Mertz because of their protected activity were supported by substantial evidence.

## IV. BIAS AND PARTIALITY

The employer also argues that the ALJ's findings are the result of bias and partiality. However, the employer has presented no evidence of bias or partiality other than the ALJ's adverse credibility determinations and findings of fact and conclusions of law in the present case.

Accordingly, we deny the petition for review and enforce the order of the Board.