_____

No. 92-3911
_____

Town & Country Electric, Inc.,          *
                                        *
          Petitioner,                   *
                                        *
     v.                                 *
                                        *
National Labor Relations Board,         *
                                        *
          Respondent,                   *
                                        *
International Brotherhood of            *
Electrical Workers, Local 292,          *
                                        *
          Movant-                       *
          Intervenor/Respondent.*

_____                      Petition for Review of an
                                 Order of the National Labor
No. 93-1218                      Relations Board.
_____

Town & Country Electric, Inc.;          *
Ameristaff Personnel                    *
Contractors, Ltd.,                      *
                                        *
          Respondents,                  *
                                        *
     v.                                 *
                                        *
National Labor Relations Board,         *
                                        *
          Petitioner,                   *
                                        *
International Brotherhood of            *
Electrical Workers, Local 292,          *
                                        *
          Movant-                       *
          Intervenor/Petitioner.*

_____

          Submitted:  April 23, 1996

               Filed:  February 5, 1997
_____

Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN and LOKEN, Circuit
     Judges.
_____

WOLLMAN, Circuit Judge.

This matter returns to us on remand from the Supreme Court.  We deny the petition for review and enforce the Board's order.

**I.**

Town & Country Electric, Inc. (Town & Country), a nonunion contractor from Wisconsin, obtained a contract to do electrical work in International Falls, Minnesota.  In the course of hiring Minnesota-licensed electricians, Town & Country refused to interview two full-time union organizers and eight union members.  It hired one union member, whom it later discharged. The Board found that Town & Country violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1) & (a)(3), by refusing to interview the applicants because of their union affiliation and by discharging the one hire for his union activities at the jobsite.  <u>Town & Country Elec., Inc.</u>, 309 N.L.R.B. 1250, 1992 WL 390106 (1992).

We denied enforcement of the Board's order, concluding that the paid union organizers and union members were not "employees" within the meaning of section 2(3) of the Act, 29 U.S.C. § 152(3).  <u>Town & Country Elec., Inc. v. NLRB</u>, 34 F.3d 625, 628-29 (8th Cir. 1994).  On writ of certiorari, the Supreme Court concluded that the Board's interpretation of "employees" as not excluding paid union organizers was lawful.  <u>NLRB v. Town & Country Elec., Inc.</u>, 116 S. Ct. 450, 457 (1995).  The Court vacated our judgment and remanded the case to us for further proceedings.  <u>Id.</u>

**II.**

Town & Country received the contract for the International Falls job in early September 1989 and was to start work on September 11.  Town & Country learned that Minnesota law required

it to have one Minnesota-licensed electrician on the job for every two unlicensed electricians. Because Town & Country had no Minnesota-licensed electricians on its staff, it retained Ameristaff, a temporary personnel service, to recruit Minnesota-licensed electricians. Any electricians hired would be carried as Ameristaff's employees but would be subject to Town & Country's plenary authority and control.

Ameristaff placed ads in a Minneapolis newspaper on September 3 and planned to conduct interviews at a Minneapolis hotel on September 7. Ron Sager, human resources manager for Town & Country, made it clear to Ameristaff before the ad was placed that Town & Country needed more than one electrician and that applicants had to be willing to work a nonunion job.[1] As part of the screening process, Ameristaff's receptionist asked potential applicants whether they preferred to work union or nonunion and if they preferred union work, whether they would work a nonunion job. Ameristaff ultimately set up interviews for seven applicants.

Sager, along with Town & Country project manager Dennis Defferding and Ameristaff president Steven Buelow, flew from Town & Country's headquarters in Appleton, Wisconsin, to Minneapolis on September 7. They did not arrive at the hotel until 11 a.m. because their flight was delayed. When they arrived, only one applicant with a scheduled interview was waiting. Also waiting were approximately one dozen members of Local 292 of the International Brotherhood of Electrical Workers. Local 292 officials had learned of the ads and encouraged their unemployed members to apply and, if hired, organize the jobsite.

The applicants accompanied the company officials to the interview rooms. Sager described Town & Country and explained its

---

[1]Town & Country refers to itself as a "merit shop." We will use the designation "nonunion employer" for clarity's sake.

employee benefits plans. The applicants then filled out applications while Sager and Defferding began interviews in another room. They first interviewed a union member who did not have an appointment and then the sole applicant who had scheduled an interview. Neither was offered a position. Buelow told Sager that none of the remaining applicants had appointments for interviews. Sager asked how those present had known about the interviews. Buelow responded by showing Sager several applications and stating, "I think they're union." Buelow returned to the other room and told the eleven remaining applicants that the job was nonunion. The applicants generally replied that they were interested in any work available. Buelow read off a list of applicants with appointments, none of whom was present. Buelow told the union members that he did not know if anyone without an appointment would be interviewed. One of the union members replied that there were licensed journeymen present who could take the place of those with scheduled interviews.

Sager decided to return to Appleton without interviewing anyone else, allegedly because he had to attend an important meeting that afternoon. He announced to the remaining applicants that no further interviews would be conducted and requested that they leave. One of the union members, Malcolm Hansen, protested that he had called Ameristaff that morning and scheduled an interview. After confirming that this was true, Sager agreed to interview Hansen. He refused to interview anyone else and threatened to call hotel security if the remaining union members did not leave.

The administrative law judge (ALJ) concluded that the General Counsel had established a prima facie case that Town & Country had discriminatorily refused to consider for hire the ten applicants it had refused to interview. The ALJ rejected Town & Country's defenses largely on the basis of his determination that Sager's proffered reasons for his decision to immediately end the

interviews were implausible and not credible.  The ALJ concluded that Town
& Country had violated section 8(a)(3) because it failed to establish that
it would not have interviewed and considered for hire the ten remaining
applicants in the absence of their union membership.  See York Prods., Inc.
v. NLRB, 881 F.2d 542, 544-45 (8th Cir. 1989) (setting forth burden-
shifting analysis).  The Board affirmed the ALJ's findings and agreed with
the ALJ's conclusions.

### III.

Our standard of review affords great deference to the Board's
affirmation of the ALJ's findings.  We will enforce the Board's order if
the Board has correctly applied the law and its factual findings are
supported by substantial evidence on the record as a whole, even if we
might have reached a different decision had the matter been before us de
novo.  Wilson Trophy Co. v. NLRB, 989 F.2d 1502, 1507 (8th Cir. 1993).  See
also Handicabs, Inc. v. NLRB, 95 F.3d 681, 684 (8th Cir. 1996).
Credibility determinations are for the ALJ to make.  We have characterized
the broad deference we extend to an ALJ's credibility determinations in
terms of a shock-the-conscience standard of review:

> The rule in this Circuit is that `the question of credibility
> of witnesses and the weight to be given their testimony' in
> labor cases is primarily one for determination by the trier of
> facts.  Paramount Cap Mfg. Co. v. NLRB, 260 F.2d 109 (8 Cir.
> 1958); Kitty Clover, Inc. v. NLRB, 208 F.2d 212, 214 (8 Cir.
> 1953).  See also, NLRB v. Walton Mfg. Co., 369 U.S. 404, 407-08
> (1961).  This Court is not the place where that question can be
> resolved, unless it is shocking to our conscience.  It is not
> so here.

NLRB v. Morrison Cafeteria Co. of Little Rock, Inc., 311 F.2d 534, 538 (8th
Cir. 1963).  Although we have frequently applied the shock-the-conscience
standard of review, see, e.g., Golden Eagle Spotting Co. v. Brewery Drivers
and Helpers, Local Union 133, 93

F.3d 468 (8th Cir. 1996); NLRB v. Monark Boat Co., 800 F.2d 191 (8th Cir. 1986), we have cautioned against a blind application of the Morrison Cafeteria test by saying that "this rule is not to be applied mechanically so as to compel us to sustain any finding concerning conflicting testimonial evidence."  NLRB v. Midwest Hanger Co., 550 F.2d 1101, 1104 (8th Cir.), cert. denied, 434 U.S. 830 (1977).  See also Buffalo Bituminous, Inc. v. NLRB, 564 F.2d 267, 269 (8th Cir. 1977); NLRB v. Payless Cashway Lumber Store of South St. Paul, 508 F.2d 24, 28 (8th Cir. 1974).

Under the standard of review announced in the Paramount and Kitty Clover decisions cited in Morrison Cafeteria, an ALJ's credibility determinations are considered with the rest of the NLRB's factual findings under the general substantial evidence test derived from Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951).

In NLRB v. Fruin-Colnon Constr. Co., 330 F.2d 885, 889-90 (8th Cir. 1964), we said

> [w]hile this Court respects the prerogative of the trier of fact in an unfair labor practice case to resolve issues of the witnesses' credibility in arriving at a decision based thereon, we cannot avoid our greater responsibility under Universal Camera to fairly weigh against the Board's findings the countervailing evidence independent of and consistent with its credibility determinations.  (Cited cases omitted.)

Similarly, in NLRB v. Payless Cashway Lumber Store, we stated:

> We reach this decision in full awareness of the rule that the question of credibility of witnesses and the weight to be given their testimony is primarily one for determination by the trier of facts.  But the rule is not one to be applied mechanically for if we were to so apply it, the substantial evidence test set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(E), and in Universal Camera Corp. v. NLRB [citation omitted], would be meaningless.  The reviewing court would be compelled to sustain any finding as to which testimonial

-6-

evidence was conflicting.

508 F.2d at 28 (citations omitted).

Although we see no inherent conflict between the shock-the-conscience standard of review and the earlier and more traditional standard articulated in Paramount, Kitty Clover, and Fruin-Colnon Constr. Co., we prefer to apply the latter standard, based as it is on the teachings of Universal Camera. Viewing the record in the light of that standard of review, we conclude that the Board's findings are supported by substantial evidence, and we agree with the Board's conclusion that Town & Country violated sections 8(a)(1) and (a)(3) with respect to the ten applicants it refused to interview and consider for hire. On Thursday, September 7, Town & Country did not have a single licensed electrician for a job that started the next Tuesday, September 11. When Sager, Buelow, and Defferding arrived at the hotel, they were pleased with the size of the turnout even though it was larger than the number of scheduled appointments. Sager made his decision to interview only those applicants with appointments, effectively terminating the interviews, only after Buelow told him that the remaining applicants were union members. Sager testified that he suspected that Town & Country was being harassed or set up. The ALJ's decision to discredit Sager's various explanations for why he decided to terminate the interviews is not so lacking in evidentiary support as to require us to set it aside.

## IV.

Sager interviewed and hired Hansen for the International Falls job, knowing that Hansen was a union member. Although Hansen was technically an Ameristaff employee, Town & Country retained sole discretion regarding his supervision and discharge.

Hansen reported to the jobsite on Monday, September 11. The five-man crew (Supervisor Rod Smithback, Mike Grow, Randy Reinders, Tom Steiner, and Hansen) began work Tuesday, September 12. Hansen hinted about his union membership that day. During a morning break the following day he openly announced that he was a union member and was there to organize for the union. Smithback and Sager repeatedly told Hansen not to talk about the union, whether at work or at the cabin where the crew was staying. Grow, Reinders, and Steiner repeatedly told Hansen they were not interested in joining the union and complained to Smithback about Hansen's talking and pressure. Smithback told Hansen he was not interested in joining the union and asked Hansen what it would take for Hansen to drop his union membership and "come over" to Town & Country's side. With tensions already high, a confrontation occurred at lunch on September 14 between Hansen and other crew members about Hansen's organizing pressure.

On September 14, Sager informed Buelow that because state law prevented Town & Country from using Ameristaff's temporary personnel on the jobsite, it could no longer use Hansen to meet the state requirements unless it directly hired him, which it did not intend to do. After this conversation, Buelow discharged Hansen that afternoon. Hansen called Sager to ask if Town & Country would hire him directly onto its payroll, to which Sager responded, "Absolutely not."

The ALJ found that the General Counsel made a prima facie case that Town & Country's decision not to retain Hansen was motivated by Hansen's union activity. Town & Country offered the defenses that Hansen was a poor worker who failed to meet productivity standards and failed to perform in a craftsmanlike manner. See Mississippi Transport, Inc. v. NLRB, 33 F.3d 972, 979 (8th Cir. 1994) (elements of unlawful discharge case and employer's defense). The ALJ discredited these defenses, characterizing Town & Country's case as "shifting, replete with contradiction," its witnesses as

"biased," and its defense as "structured upon a composite of lies."  The ALJ concluded that Town & Country's decision to not retain Hansen was based upon Hansen's union activities, in violation of sections 8(a)(1) and (a)(3).

The record supports the ALJ's rejection of Town & Country's defenses. At the time of Hansen's termination, the only objective complaint Smithback documented was Hansen's lack of productivity.  Town & Country's allegations that Hansen's work was not of craftsmanlike quality and that Hansen misused and abused Town & Country's tools were not documented during Hansen's tenure, and the ALJ found that they were post-hoc justifications.  Sager admitted at the hearing that Hansen's alleged violation of safety rules was not a factor in the decision to terminate him.  Town & Country claimed it would have discharged Hansen earlier in the week due to his lack of productivity except that it needed his Minnesota license.  The ALJ found, however, that at the time of Hansen's discharge, Town & Country needed at least two licensed electricians at the jobsite, did not have a replacement for Hansen, and risked not being able to work without having a licensed electrician.

Town & Country stated that one factor in its decision not to retain Hansen was the crew's low morale and the disharmony Hansen was causing. We agree with the ALJ that the evidence clearly showed that the disharmony was due to Hansen's organizing activities.  Furthermore, while the disharmony set the stage for the noontime confrontation that occurred on September 14, the confrontation was directly the product of Hansen's organizing activities on nonworking time, which was protected activity. The ALJ found that this was the event that sealed Town & Country's decision not to retain Hansen, a finding that supports the inference of improper motivation.  See Hall v. NLRB, 941 F.2d 684, 689 (8th Cir. 1991) (coincidence between protected activity and discharge supports inference of illegal motive).

-9-

Although Hansen may not have been a model employee,[2] Town & Country failed to establish that it decided to discharge Hansen on the basis of his level of productivity. As we stated in Mississippi Transport, 33 F.3d at 979, it is the employer's burden of proving by a preponderance of the evidence "that it would have discharged [the employee] even in the absence of his union activities." We conclude that substantial evidence supports the ALJ's conclusion that Town & Country's failure to retain Hansen was motivated by Hansen's protected union activities. Cf. Hall, 941 F.2d at 689 (evidence supported finding of illegal discharge where, among other things, employer's testimony regarding poor work was discredited, shifting reasons were given for discharge, chronological proximity existed between discharge and employee's protected union activities, and employee was interrogated regarding union sentiments and activities).

## V.

Town & Country argues that the ALJ's credibility determinations and resulting factual findings were based on a presumption that Town & Country was motivated by anti-union bias because it is a nonunion employer. Town & Country argues that because the ALJ used this presumption to discredit its witnesses, the presumption was effectively irrebuttable. Contrary to what Town & Country cites in its brief, however, the ALJ used no such express presumption. Furthermore, a fair reading of the ALJ's

---

[2]Indeed, had the ALJ credited the testimony of Hansen's co-workers, he would have found that Hansen failed to accurately bend and cut lengths of conduit; that he broke an inordinate number of blades because of his improper use of a portable bandsaw; that he chipped and dulled a large number of drill bits by failing to first drill a pilot hole and then enlarge the hole with a larger bit; that he improperly cut and threaded pieces of pipe; and that he abused a pipe-threading machine by pounding on it with a hammer rather than by tightening the locking mechanism by hand. Under this view of the testimony, Hansen was either an incompetent or a saboteur.

opinion and his questioning of witnesses at the hearing does not reveal the implicit use of such a presumption. See Hall, 941 F.2d at 689 (rejecting employer argument that ALJ's findings were the result of bias when only basis for claim was ALJ's adverse credibility determinations and findings of fact). Moreover, an ALJ may properly use an employer's attitudes about unions as one factor in evaluating the credibility of the employer's witnesses and drawing inferences regarding the employer's motive. See id. at 688; York Prods. Inc., 881 F.2d at 546; Ballou Brick Co. v. NLRB, 798 F.2d 339, 342 (8th Cir. 1986); McGraw-Edison Co. v. NLRB, 419 F.2d 67, 75 (8th Cir. 1969).

## VI.

Town & Country argues that Hansen was not retained because he violated a company rule against union solicitation on work time. Town & Country also argues that it had a legitimate business reason for not hiring the union members or retaining Hansen in that their obligations under the union's "salting" resolution created an irreconcilable and disqualifying conflict of interest with the obligations they owed Town & Country as their employer.[3] Town & Country raises both of these arguments for the first time on remand. Objections not urged before the Board are not to be considered by a reviewing court absent extraordinary circumstances. 29 U.S.C. § 160(e); Radisson Plaza Minneapolis v. NLRB, 987 F.2d 1376, 1382-83 (8th Cir. 1993). The conflict-of-interest argument was previously raised only in the context of whether the union organizers were statutorily defined "employees," not as a defense

---

[3]Salting is a practice whereby a union local authorizes its members to work on nonunion projects in order to organize the project. The members, or "salts," are reimbursed for the differences in wage scales and benefits, and their expenses. The salts work at the jobsite until it is organized or when directed to leave by the union. See Town & Country, 34 F.3d at 629; Herbert R. Northrup, "Salting" the Contractors' Labor Force: Construction Unions Organizing with NLRB Assistance, 14 J. Lab. Res. 469 (1993).

for Town & Country's actions.  The no-solicitation-rule argument was not raised in the exceptions Town & Country filed with the Board, and our review of the record shows that no evidence of such a rule was presented at the hearing.  Town & Country has not demonstrated extraordinary circumstances requiring our examination of these arguments, and we decline to do so.

The Board's order is enforced.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.