# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2439

_____

National Labor Relations Board,　　　　*

　　　　　　　　　　　　　　　　　　　　*

　　　　　　　　Petitioner,　　　　　　　*

　　　　　　　　　　　　　　　　　　　　*　　Petition for Enforcement of a

　　　　v.　　　　　　　　　　　　　　　*　　Final Order of The National

　　　　　　　　　　　　　　　　　　　　*　　Labor Relations Board.

Rockline Industries, Inc.,　　　　　　　*

　　　　　　　　　　　　　　　　　　　　*　　　　　　[PUBLISHED]

　　　　　　　　Respondent.　　　　　　　*

_____

Submitted: February 18, 2005

Filed: June 21, 2005 (corrected 6/24/05)

_____

Before WOLLMAN, HANSEN, and BENTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

The National Labor Relations Board (Board) petitions for enforcement of an order it entered finding that Rockline Industries, Inc. (Rockline) engaged in unfair labor practices and ordering Rockline to reinstate David Kennan, an employee that Rockline had suspended and then discharged in violation of § 8(a)(3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(3) (2000).  We grant the petition and enforce the order.

Rockline Industries employs approximately 650 employees at its manufacturing facility in Springdale, Arkansas. In May 2002, the United Food and Commercial Workers Union, Local 2008 (Union) began an organizational campaign at Rockline's facility. David Kennan had begun working at Rockline in 1997 and was employed as a maintenance worker. Kennan became a member of the union organizing committee in June 2002 and participated in the organizing drive by attending union meetings, passing out union literature, and soliciting union membership.

Rockline promulgates an employee handbook that contains rules governing employee discipline and sets out a progressive discipline policy consisting of a verbal warning, an initial written warning, a final written warning (which may include suspension), and final termination. (J.A. at 316.) In June 2002, Kennan received a written warning for interrupting the work of a co-worker for ten minutes to discuss union-related activities.[1] Prior to this time, Kennan had received one verbal warning for not performing his job duties during his five years of employment. On August 27, 2002, Kennan was not scheduled to work. Instead, he distributed pro-union literature in the parking lot of Rockline. During work two days later, Kennan stopped a warehouse employee, Bonnie Bunch, who was operating a forklift, and told her that "those fliers they [Rockline] are handing out are illegal." The evidence is disputed as to the length of the conversation, but Bunch told Kennan that she did not know anything about it and drove off. Bunch did not report the incident, but her supervisor later asked her to prepare a statement about the incident.

The following day, Kennan greeted another employee, Duane Stevens, on the plant floor, and Stevens responded by saying something about "that union crap."

---

[1]The Board did not include this disciplinary action in its charges of unfair labor practices against Rockline.

Kennan told Stevens that he could not discuss union issues during work time, but would be glad to discuss it with him during break time. Stevens responded that he would rather discuss it "in the parking lot," and the two exchanged a few more words. Kennan reported to his administrator, Catherine Jones, that Stevens had threatened him and asked to see Human Resources Director Sam Wilson about it. Kennan was called to Wilson's office later that day, where Jones and Kennan's supervisor, Linda Riley, were present. Kennan voiced his complaint to Wilson about Stevens, stating that he felt threatened by Stevens' words. Wilson agreed to investigate, but told Kennan not to expect much since it was a "he said/she said" kind of situation. Stevens later denied that he intended to threaten Kennan, though he thought Kennan might have misunderstood what he had said as a threat. Stevens was not disciplined in relation to the incident.

After Kennan discussed the Stevens incident with Wilson, and as part of the same conversation, Wilson told Kennan that he had a couple of things to discuss with him. Wilson first brought up Kennan's distribution of papers in the parking lot on August 27. Wilson told Kennan that if he came to the premises on his day off, he needed to get a visitor's badge. Wilson presented Kennan with a written "Employee Warning Record" and asked Kennan to sign it. The warning detailed his actions in distributing the papers, not mentioning that the papers were pro-union literature, and stated that Kennan's presence in the parking lot presented a security issue. The warning directed Kennan to obtain a visitor's pass if he came to Rockline on a day when he was not scheduled to work, and it informed Kennan that he needed permission to go to areas of the plant other than human resources on such visits. The warning stated that Kennan "will be terminated if [he] violates this direction." Rockline has never insisted on such requirements from any of its other employees. After giving Kennan the written warning, Wilson also gave Kennan a written suspension notice premised on Kennan's actions the prior day in stopping a warehouse employee (Bunch) from performing her work to discuss non-work-related issues. The notice did not identify Bunch by name, and Wilson did not ask Kennan

for his version of the events. Again, the notice did not mention whether the non-work-related discussion was related to the union.

Following his suspension, Kennan returned to work on September 6. He carried a small tape recorder in his shirt pocket, which two co-employees saw and reported to Kennan's supervisor, Riley, and to Continuous Improvement Coordinator Pattie Whisenhunt. From the adjacent patio, Riley and Whisenhunt observed Kennan in the break room for approximately 15 minutes acting, in their minds, suspiciously. Kennan was not on break at the time, and although his job duties included emptying waste baskets in the break room, it did not appear that he was doing any work. After Kennan left the break room, Whisenhunt told two employees who had been in the break room that Kennan had a tape recorder and appeared to have been taping their conversation. The two employees complained to Jones and Wilson about the tape recorder, asking whether state law allowed Kennan to record their conversations without their knowledge. Neither Riley nor Whisenhunt (both supervisors) informed Wilson of their suspicion that Kennan had a tape recorder or confronted Kennan about it.

Later that afternoon, Kennan was called to Wilson's office and asked about the tape recorder. He admitted having one but denied taping any conversations. Wilson informed Kennan that he was being terminated for bringing the tape recorder to work and for being disruptive. Kennan's termination notice (which was already prepared when Kennan arrived in Wilson's office) stated: "TAPE RECORDER IN PLANT-CAUSING EMPLOYEE PROBLEMS." Wilson later testified at the administrative hearing that Kennan was also terminated because he kept other employees from doing their jobs, including twice earlier that day, and because Kennan was not doing his job. Neither of these reasons was expressed to Kennan at the time of his termination or stated on the termination notice.

The Union filed charges against Rockline with the Board, and the Board filed a complaint against Rockline on February 28, 2003. The complaint alleged that Rockline violated § 8(a)(3) of the NLRA by warning, suspending, and discharging Kennan.[2] An Administrative Law Judge (ALJ) held a hearing in September 2003 and recommended to the Board that, based on the evidence and the witnesses' credibility, Rockline had violated the NLRA when it warned, suspended, and terminated Kennan. The Board adopted the ALJ's recommended order, with modification. The Board now petitions this court for enforcement of its final order. See 29 U.S.C. § 160(e) (2000). Rockline challenges the order related to Kennan's suspension and termination, but does not dispute that the warning given to Kennan for distributing union literature in the parking lot on his off-duty time violated the NLRA. The Board is therefore entitled to summary enforcement of that part of its order. We turn to the contested findings.

II.

We will enforce the Board's order as long as the Board correctly applied the law, and its findings are supported by substantial evidence, even if we might have reached a different decision on de novo review. N.L.R.B. v. La-Z-Boy Midwest, a Div. of La-Z-Boy Inc., 390 F.3d 1054, 1058 (8th Cir. 2004); King Soopers, Inc. v. N.L.R.B., 254 F.3d 738, 742 (8th Cir. 2001). Substantial evidence is such evidence that a reasonable mind would find adequate to support the Board's conclusion. La-Z-Boy, 390 F.3d at 1058. Although we give great deference to the fact finder's credibility assessments, these, too, must be supported by substantial evidence. Id.

---

[2]The complaint also alleged that Wilson violated § 8(a)(1) of the NLRA by engaging in illegal surveillance of a union meeting. Following the hearing, the Board adopted the ALJ's recommendation that the surveillance charge be dismissed; thus, that charge is not at issue on appeal.

Under § 8(a)(3) of the NLRA, an employer commits an unfair labor practice when, "by discrimination in regard to . . . any term or condition of employment [it] encourage[s] or discourage[s] membership in any labor organization." 29 U.S.C. § 158(a)(3). This section makes it an unfair labor practice for an employer to discipline an "employee in order to discourage [him] from engaging in union activities." SCA Tissue N. Am. LLC v. N.L.R.B., 371 F.3d 983, 988 (7th Cir. 2004). To support a violation of § 8(a)(3) based on employee discipline, the General Counsel of the Board "must make a prima facie showing that protected conduct was a 'motivating factor' in the employer's decision to discipline the employee." La-Z-Boy, 390 F.3d at 1057 (describing the NLRB's burden-shifting analysis of Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982)). The Sixth Circuit describes the prima facie case as containing the following elements: "(1) the employee was engaged in protected activity; (2) . . . the employer knew of the employee's protected activity; and (3) . . . the employer acted as it did on the basis of anti-union animus." FiveCAP, Inc. v. N.L.R.B., 294 F.3d 768, 777 (6th Cir. 2002). The burden then shifts to the employer to put forward a legitimate reason for the discipline and to establish that it would have taken the same disciplinary action notwithstanding the employee's protected conduct. La-Z-Boy, 390 F.3d at 1057; Hall v. N.L.R.B., 941 F.2d 684, 688 (8th Cir. 1991).

The Board found that Rockline's discipline of Kennan violated the NLRA on three separate occasions: the August 30 written warning for distributing "papers" in the parking lot on August 27; the August 30 three-day suspension for interrupting Bunch's work on August 29; and the September 6 termination related to bringing a tape recorder to work and causing employee problems on September 6. As noted above, Rockline does not dispute that the written warning for distributing papers in the parking lot violated the NLRA by discouraging union activity.

The ALJ noted that few of his findings depended on contradictions in the testimony, but discredited Bunch's hearing testimony that her encounter with Kennan

lasted five to eight minutes to the extent that her testimony contradicted her more contemporaneous written statement, which the ALJ construed as describing an incident that could not have lasted more than fifteen seconds. His "chief credibility determinations" included rejection of Rockline's justifications for its actions in light of its establishment of a rule affecting only Kennan, its disparate treatment of Kennan compared to other employees, and its change in position between the initial reasons stated in the termination notice and the reasons given at the hearing. In adopting the ALJ's recommended order, the Board found no reason to reverse the ALJ's credibility findings. (Appellant's Add., Order at 1 n.2.) It did, however, limit its finding of pretext regarding the three-day suspension solely to evidence of disparate treatment, specifically that Kennan was disciplined for interrupting Bunch's work, while Stevens was not disciplined for interrupting Kennan's work. (Id. n.3.)

Rockline does not dispute that Kennan was generally engaged in protected activity related to his involvement in the union organizing committee or that it was aware of his activities. Rockline focuses on the third element of the prima facie case and argues that there is no evidence that there was a causal connection between Kennan's protected activity and his disciplinary suspension and termination, neither of which related to incidents involving Kennan's participation in protected activity. Rockline also argues that the Board erroneously found that Rockline's justifications for its disciplinary actions were pretextual.

"[G]eneral hostility toward the union does not itself supply the element of unlawful motive." GSX Corp. of Mo. v. N.L.R.B., 918 F.2d 1351, 1357 (8th Cir. 1990). Although Rockline openly opposed the Union, other than its dealings with Kennan, there is no evidence that it ever threatened or intimidated employees for engaging in union activity. Rockline distributed information to its employees encouraging them to weigh the pros and cons of unionization, though it warned the employees not to discuss union issues during work time. Evidence of Rockline's union animus is fairly weak as compared to other cases finding union animus. See

id. (finding sufficient evidence of hostility from statements that management was tired of dealing with the current union's frivolous complaints and preferred a different union, noting that such evidence was relatively mild compared to then recent cases, including York Prods., Inc. v. N.L.R.B., 881 F.2d 542, 543 (8th Cir.1989) (employer threatened over 50 times to close the plant if a union was organized); DeQueen Gen. Hosp. v. N.L.R.B., 744 F.2d 612, 615 (8th Cir. 1984) (administrator told supervisors to get rid of union employees if the opportunity arose); Ballou Brick Co. v. N.L.R.B., 798 F.2d 339, 345 (8th Cir. 1986) (employer threatened employees); N.L.R.B. v. Quick Find Co., 698 F.2d 355, 357 (8th Cir. 1983) (employer fired all but two employees in the proposed bargaining unit after the union sought recognition)).

Nevertheless, sufficient evidence exists in the record as a whole to support the Board's finding that Rockline was motivated by union animus when it suspended and then terminated Kennan. We have previously considered such factors as: an employer admitting to recent discriminatory conduct, see Golden Eagle Spotting Co. v. Brewery Drivers and Helpers, Local Union 133, 93 F.3d 468, 471 (8th Cir. 1996) (noting that employer's uncontested NLRA violations lent support to the Board's other findings); an employer treating its union and anti-union employees disparately, see Berbiglia, Inc. v. N.L.R.B., 602 F.2d 839, 844 (8th Cir. 1979) ("[T]he convincing evidence of disparate treatment of union and anti-union employees furnishes the keystone for the arch of the Board's case."); and an employer changing the justifications for its disciplinary actions, see Hall, 941 F.2d at 688 ("[F]alse or shifting reasons support a finding of illegal motivation."). All of these factors are present in this case and support the Board's finding of discriminatory motive.

A.      Three-Day Suspension

Kennan was clearly involved in protected activity when he distributed union literature during his off-work time, and Rockline does not dispute that it violated the NLRA by disciplining him for it. Rockline tried to hide its true motives for that

discipline by stating first security, and then safety, as its legitimate reasons for issuing the warning to Kennan. However, the Board found that Rockline singled out Kennan for disparate treatment when it issued the warning requiring Kennan to get a visitor's pass and prohibiting him from entering the premises on an off-duty day, even though other employees' friends and spouses often did so. See Hall, 941 F.2d at 688 ("[F]alse or shifting reasons support a finding of illegal motivation."). This is important background information regarding Rockline's motives toward Kennan, as it occurred just two days prior to the incident resulting in Kennan's suspension. See id. ("The timing of an adverse employment decision is given great weight in unlawful discharge cases as an indication of anti-union motive."); cf. Sioux Quality Packers, Div. of Armour & Co. v. N.L.R.B., 581 F.2d 153, 157 (8th Cir. 1978) (finding that a discriminatory discharge in October did not support the Board's conclusion that a discharge seven months later was likewise discriminatory, absent other evidence).

Rockline's articulated reason for suspending Kennan for three days was that he had interrupted another employee's work for non-work-related purposes. The Board found this stated reason to be pretextual because Kennan was treated differently than Stevens, who had interrupted Kennan during work hours to express his anti-union views but was not disciplined. "It is often reasonable for the Board to infer animus from unequal treatment of similarly situated employees." La-Z-Boy, 390 F.3d at 1061. Kennan was disciplined for disrupting Bunch's work even though Bunch never complained to anyone; rather, Bunch's supervisor sought her out and asked her to make a statement concerning the incident. Even then, Bunch did not allege that Kennan disrupted her work. Kennan was not given an opportunity to respond but was summarily suspended the following day. In fact, the suspension notice was already prepared when Kennan was called to Wilson's office to discuss the incident. In contrast, when Kennan reported Stevens' comments to Wilson, Wilson's initial response to Kennan was not to expect much. Stevens was then given an opportunity to respond to the allegations and was not disciplined for the incident.

The parties dispute the length of Kennan's conversation with Bunch. If it lasted the five to ten minutes urged by Rockline, the length of the conversation could legitimately support Kennan's discipline and distinguish it from the lack of discipline to Stevens. Two considerations counsel against finding this timing dispute sufficient to overturn the Board's findings of disparate treatment. First, the Board accepted the ALJ's credibility findings, which included discrediting Bunch's testimony that the conversation lasted five to eight minutes. Great deference is given to a fact finder's credibility assessments, see JHP & Assocs., LLC v. N.L.R.B., 360 F.3d 904, 910-11 (8th Cir. 2004) (citing Golden Eagle Spotting Co., 93 F.3d at 471 ("We will not overturn Board findings that are based on credibility determinations unless those findings shock the conscience.")), and Bunch's vague statement given to her supervisor provides record support for the ALJ's decision to discredit Bunch's hearing testimony. Further, regardless of the length of the conversation, Rockline still treated Kennan disparately in its investigation of the incident as compared to its investigation of the discussion between Kennan and Stevens. Kennan was not asked his version of the events concerning the Bunch conversation. Instead, he was called to Wilson's office and summarily given the suspension notice. Even then, he was not informed of the specific incident supporting the allegations of interrupting a co-employee's work stated in the suspension notice. By contrast, Kennan's complaint about Stevens was virtually ignored, with Wilson responding that Kennan should not expect much. Stevens was later asked for his version of events and ultimately was not disciplined for the incident. Notably, the incident was documented in Kennan's personnel file but not in Stevens' file.

Finally, Wilson gave Kennan the written disciplinary notice for distributing papers, which concededly violated § 8(a)(3), on the same day as the suspension notice. Given the temporal proximity of the violative disciplinary action to the action at issue, the failure of Rockline to investigate, and its refusal to allow Kennan to respond to the allegations, there is sufficient evidence in the record to support the

Board's findings that Rockline's stated reason for suspending Kennan was pretextual and that Rockline violated § 8(a)(3) when it suspended Kennan for three days.

B.      Termination

Kennan carried a tape recorder in his pocket on the day that he returned to work following his suspension. Co-employees who saw the tape recorder reported to two supervisors that Kennan was carrying it. Rather than confronting Kennan about the tape recorder or informing the Human Resources Director, the supervisors told other employees in the break room that it appeared that Kennan was trying to record their conversations. Later that day Kennan was called to Wilson's office, where Wilson informed him that his employment was being terminated because he had a tape recorder and was being disruptive. Again, there was no investigation and Kennan was not allowed to respond to the allegations prior to his termination. The written termination notice stated that Kennan's termination was based on "TAPE RECORDER IN PLANT–CAUSING EMPLOYEE PROBLEMS." At the hearing, Wilson testified that Kennan was terminated for the additional reasons that he was keeping other employees from doing their jobs and he was not doing his own job. However, Rockline failed to articulate these reasons to Kennan at the time of his termination. Further, Rockline had no policy regarding tape recorders on the premises. In fact, another employee, Edward Reygadas, brought a tape recorder to work less than a year prior to this incident. He was confronted about the tape recorder and told not to bring it to work but was not disciplined. Rockline's different responses to these incidents suggest disparate treatment, and thus union animus.

Rockline claims that the Reygadas incident was distinguishable because Reygadas did not have prior written warnings under Rockline's progressive discipline policy. Rockline misses the point. Kennan was not treated disparately because he was terminated and Reygadas was not. The disparate treatment comes from being disciplined at all for something not covered by Rockline's employment policies and

from the lack of investigation or confrontation. Further, Kennan was terminated the first day back from a suspension that the Board found to be discriminatory, and a week after Rockline discriminatorily disciplined Kennan for distributing union literature. Like the policy created specifically for Kennan regarding his presence on Rockline property on his days off, Rockline again created a policy specific to Kennan. Given the shifting justifications offered by Rockline for terminating Kennan, his disparate treatment relative to Reygadas, and the close timing to Kennan's distribution of union literature and Rockline's ensuing discriminatory discipline, the Board's findings are supported by substantial evidence in light of the record as a whole. See Hall, 941 F.2d at 688 (shifting justifications and the timing of discipline relative to protected activity support finding that union animus motivated employer's actions).

## III.

Engaging in protected activity does not shield employees from legitimate disciplinary action by their employer. Employers still control their workforce even if their employees are (or seek to be) represented by a union. Protected activity is just that however–protected–and employers cannot single out employees who engage in such activities for adverse or disparate treatment. Having disciplined an employee who has engaged in protected activity, it is not enough that an employer put forth a nondiscriminatory justification for discipline. It must be the justification. See SCA Tissue N. Am., 371 F.3d at 991-92 ("SCA's asserted justification for its termination decision . . . appears to have furnished the excuse rather than the reason for the discharge." (internal marks omitted)). While we find this to be a close case, given our limited review, we enforce the Board's order, as it is supported by substantial evidence in the record as a whole.

_____